**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

VICTOR ROBERT NAVA, SR., aka Big
Vic,
            *Defendant,*

and

VICTORIA NAVA,
            *Defendant-Appellant.*

No. 03-30010

D.C. No.
CR-00-00121-JDS

OPINION

Appeal from the United States District Court
for the District of Montana
Jack D. Shanstrom, District Judge, Presiding

Argued and Submitted
March 5, 2004—Seattle, Washington

Filed April 18, 2005

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Rymer

**COUNSEL**

Jack E. Sands, Attorney at Law, Billings, Montana, for the appellant.

William W. Mercer and James E. Seykora, U.S. Attorney's Office, Billings, Montana, for appellee United States of America.

## OPINION

BYBEE, Circuit Judge:

Victor "Big Vic" Nava, Sr., was convicted of conspiracy to distribute and possession with intent to distribute methamphetamine. The jury also rendered a special verdict that several properties were used to facilitate his crimes or were proceeds of them and should be forfeited to the government pursuant to 21 U.S.C. § 853. Victor's daughter, Victoria Nava, petitioned the district court claiming that she held legal title to two of the properties. The district court denied Victoria's petition to set aside the forfeiture.

We must decide whether forfeiture was proper where Victor has never held title to the two forfeited properties. We reverse and remand.

## I. BACKGROUND AND PROCEEDINGS

### A

The government may seek the forfeiture of property in either a civil or a criminal proceeding. The principal civil drug forfeiture provision, 21 U.S.C. § 881, operates *in rem* against the property itself on the theory that the property itself is guilty of wrongdoing. *See Austin v. United States*, 509 U.S. 602, 614-18 (1993); *United States v. Lester*, 85 F.3d 1409, 1414 n.8 (9th Cir. 1996) ("[A] civil forfeiture is an *in rem* proceeding in which liability attaches to a particular property and not particular institutions or individuals." (quoting *United States v. $814,254.76 in United States Currency*, 51 F.3d 207, 210-11 (9th Cir. 1995))). In contrast, criminal forfeiture provisions operate *in personam* against the assets of the defendant and serve as part of the penalty for the defendant's conviction. *See, e.g.*, 18 U.S.C. § 1963; 21 U.S.C. § 853; *see also United States v. $814,254.76*, 51 F.3d at 210-11 ("A criminal forfeiture is an *in personam* judgment against a per-

son convicted of a crime" (citing *Alexander v. United States*, 509 U.S. 544, 558-59 n.4 (1993))); *United States v. Certain Real Property at 2525 Leroy Lane*, 910 F.3d 343, 346 (6th Cir. 1990) (§ 853 "authorizes an *in personam* action against a defendant in a criminal case, and forfeiture in such a case is imposed as a sanction against the defendant upon his conviction.").

In a proceeding under § 853, "the sole legal issue before the court is the ownership interests of the competing parties, a consideration that is often irrelevant in an *in rem* civil forfeiture action, which turns instead on the culpability of the owner and the role of the property in the prohibited activity." *United States v. McHan*, 345 F.3d 262, 281 (4th Cir. 2003) (Luttig, J., concurring in part and concurring in the judgment in part); *see also United States v. $814,254.76*, 51 F.3d at 210-11. Because the principal criminal forfeiture statute for drug offenses, 21 U.S.C. § 853, acts *in personam*, it permits the forfeiture of the defendant's interests only, not the property of innocent parties. *See United States v. Chavez*, 323 F.3d 1216, 1219 (9th Cir. 2003) (citing *Lester*, 85 F.3d at 1413). The instant case involves a criminal forfeiture under § 853 because the jury convicted Victor of multiple qualifying drug offenses.[1]

Section 853 provides that any person convicted of a violation of specified drug laws, punishable by more than a year of imprisonment, shall forfeit to the United States

---

[1]The text of § 853 is "substantially identical" to the criminal forfeiture provisions of the Racketeer Influence and Corrupt Organizations Act (RICO), 18 U.S.C. § 1963. In addition, we have noted that the two statutes "contain identical ancillary hearing provisions for adjudication of third party claims." *United States v. Hooper*, 229 F.3d 818, 821 n.7 (9th Cir. 2000). We therefore consider cases and legislative history discussing both statutes in analyzing either one. *See id.* at 821; *see also United States v. Totaro*, 345 F.3d 989, 994 (8th Cir. 2003) (decided under 18 U.S.C. § 1963(*l*)).

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; [and]

(2)  any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

21 U.S.C. § 853(a). The title to the forfeited property vests in the United States at the time the defendant commits the unlawful acts, *id*. § 853(c), although it attaches only upon the defendant's conviction. *Cf. Totaro*, 345 F.3d at 993 (citing *United States v. Ginsburg*, 773 F.2d 798, 801 (7th Cir. 1985) ("[W]hile the government's interests in the profits or proceeds of the racketeering activity does not *attach* until conviction, its interest *vests* at the time of the act that constitutes the [RICO] violation." (emphasis in original)) . At sentencing, the district court must order forfeiture of the property in addition to imposing any other sentence. *See* 21 U.S.C. § 853(a).

Section 853(n) specifies procedures under which third parties may assert their interests in the forfeited property. After the court enters the preliminary order of forfeiture as part of the defendant's sentence, the United States must publish notice of the order. 21 U.S.C. § 853(n)(1). A third party claiming an interest in the property may then petition for an ancillary hearing. *Id.* § 853(n)(2). A third party's petition asserting an interest in the property must "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." *Id.* § 853(n)(3).

The petitioner may prevail only upon showing, by a preponderance of the evidence, that he possessed a vested or superior legal right, title, or interest in the property at the time the criminal acts took place, or that he was a bona fide pur-

chaser for value. *Id.* § 853(n)(6). In particular, the court amends the order of forfeiture only upon the petitioner's showing, by a preponderance of the evidence, that

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section.

*Id.* § 853(n)(6); *see also Hooper*, 229 F.3d at 821; *United States v. Kennedy*, 201 F.3d 1324, 1334-35 (11th Cir. 2000); *United States v. Morgan*, 224 F.3d 339, 341 (4th Cir. 2000). The petitioner bears the burden of proving his right, title, or interest under § 853(n)(6). "Congress chose to place the burden of proof on the third-party during the ancillary proceeding, since the government would necessarily have carried its burden of proving that the defendant's interest in the property was subject to forfeiture during the criminal trial." *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001) (citation omitted).

Section 853(n) is the exclusive proceeding in which third parties may claim interests in property subject to criminal forfeiture. *Libretti v. United States*, 516 U.S. 29, 44 (1995) ("Once the government has secured a stipulation as to forfeitability, third-party claimants can establish their entitlement to a return of the assets *only* by means of a hearing afforded under 21 U.S.C. § 853(n)." (emphasis added)). The statute

specifically bars third parties from intervening in the trial or the appeal of a criminal case to assert their interests, or from bringing independent suits against the United States once an indictment alleging that the property is subject to forfeiture has been filed. 21 U.S.C. § 853(k). We have held that third parties must await the defendant's conviction before filing proceedings to protect their interest in the property and must await the court's order of forfeiture before requesting an ancillary hearing. *United States v. Crozier*, 777 F.2d 1376, 1382-83 (9th Cir. 1985).

B

A superseding indictment charged Victor with multiple counts of possessing marijuana and methamphetamine with intent to distribute and conspiring to possess those drugs, in violation of 21 U.S.C. §§ 841(a)(1) and 846. It alleged that the conspiracy spanned "from on or about July 11, 1997, or before, and up to and including October 6, 1999," and the possession occurred "on or about October 6, 1999." In September 2002, Victor signed a plea agreement which required him to plead guilty to drug possession and conspiracy counts. As part of the agreement, he also consented to forfeit three properties as proceeds obtained from the drug violations or property used or intended to be used to commit and facilitate the violations. The two properties that are the subject of this appeal, one at 414 South 25th Street ("the 414 property") and another at 1102 South 28th Street ("the 1102 property"), and the third property at 317 South 31st Street ("the 317 property"), are all in Billings, Montana. Victor subsequently withdrew from the plea agreement and proceeded to trial.

A jury convicted Victor of conspiracy to possess with intent to distribute methamphetamine and marijuana, and possession of those and other illegal drugs. In a special verdict, the jury found that the three properties had been "used or intended to be used to facilitate" Victor's crimes or were pro-

ceeds of his crimes. Accordingly, the district court ordered the houses forfeited.[2]

After the government published notice of the intended forfeiture, Victoria submitted a handwritten "Proof of Ownership" to the district court, claiming that two of the three properties—the 414 and 1102 properties—were hers. She moved to set aside the forfeiture order.

At an ancillary hearing to determine if forfeiture was proper, Victoria testified that she acquired the 1102 property indirectly from her grandmother, Jessie Nava, who owned the property for many years. According to Victoria, Jessie wanted Victoria to own it when Victoria reached the age of 18, and therefore deeded it in 1990 to Frank Nava, Victoria's cousin, to hold until Victoria reached that age. Victoria contended that because the property was a gift she paid only a dollar for it when Frank deeded it to her in 1996 upon her reaching her eighteenth birthday. Frank Nava's testimony corroborated this account. In addition, Victoria introduced two deeds: one from Jessie to Frank that was dated July 1990, and another from Frank to Victoria that was dated April 1996. Both deeds listed $1.00 as the consideration.

As for the 414 property, Victoria testified at the ancillary hearing that her cousin, Frank Nava, purchased it from Robert E. Lee in 1991 and that Frank deeded it to her in 1996. She claimed that Frank gave it to her for nothing, "[o]ut of the goodness of his heart." Frank testified that he gave the property to Victoria but that he did so because he hoped to keep it from his wife, whom he eventually divorced. Two deeds introduced as evidence corroborated the sequence of title. A deed dated 1991 showed a transfer from Lee to Frank, and

---

[2]The order mistakenly invoked 18 U.S.C. § 2253 (the criminal forfeiture statute for child pornography offenses), but should have invoked 21 U.S.C. § 853 (the criminal forfeiture statute for drug offenses). The ancillary forfeiture proceedings properly took place under the latter statute.

another dated 1996 showed a transfer from Frank to Victoria and listed one dollar as consideration.

Except for transfers to a bonding company, Victoria has retained title to both properties since 1996. The 414 property remains entirely in her name and has been occupied by various relatives. The 1102 property is now jointly in her and her husband's names. At the time of the hearing, she had lived at the 1102 property for six years. Victoria testified that in 2001 she deeded the 1102 property to herself and her husband, Joseph Reyna, jointly in order for them to borrow $33,000 on the house. She testified that they initially intended to use the loan for home improvements, but ultimately used it to hire a lawyer for Victor's criminal trial. Victoria's husband Joseph corroborated her account and further testified that the couple remains liable on the loan and pays monthly installments of $314. Victoria also introduced documentary evidence of this transfer. A deed dated April 2001 showed a transfer from Victoria to Victoria and Joseph jointly. A copy of Victoria and Joseph's loan application on the 1102 property also substantiated their account. The application stated that because Victoria did not work outside of the home, the property was transferred from Victoria's sole name to herself and Joseph Reyna jointly in order to secure the loan. It showed that Victoria had received the property as a gift and that the purpose of the loan was to obtain cash for unspecified purposes.

The government introduced a title search, which corroborated Victoria's account. A representative of the title company testified that, except for brief periods when the properties were deeded to a bonding company, both properties had been in Victoria's name since 1996, until 2001 when the 1102 property was placed in Victoria's and Joseph's names jointly.

The district court denied Victoria's motion to set aside the forfeiture order. The district court held that Victoria was not a bona fide purchaser for value because "she paid one dollar for one of the houses and was given the other." The court fur-

ther found that Victoria did not have legal right, title or inter-est in the properties. The court credited the jury at Victor's trial which determined that he was "the owner of both houses" and discounted Victoria's testimony after she denied knowing that her father was a drug dealer. Acknowledging that "Victor never held title to the houses," the court found that "Victoria never has maintained significant employment, and she dem-onstrated no means of paying for costs associated with the houses." The court directed the United States Marshal to sell the properties. Victoria timely appealed.

## II.   ANALYSIS

### A

**[1]** At the outset, we must determine what law to apply.[3] We have held that "[s]tate law determines whether Claimants have a property interest, but federal law determines whether or not that interest can be forfeited." *Hooper*, 229 F.3d at 820. *See also Lester*, 85 F.3d at 1412 ("Once ownership interests are defined under state law, however, the federal forfeiture statutes determine whether those property interests must be forfeited to the Government."); *United States v. Alcaraz-Garcia*, 79 F.3d 769, 774 (9th Cir. 1996) ("Under 21 U.S.C. § 853(n)(6) the 'legal right, title or interest' of the third party is determined by state law.").

**[2]** The dissent argues, relying on the Fourth Circuit's deci-sion in *Morgan*, 224 F.3d at 343, that while "legal title" must be established under state law, the question of "bare legal title" is a matter of federal law. Dissent at 4251-53. We dis-agree that the notion of "bare legal title" can be separated from the principle of "legal title" and decided as a matter of federal law. Congress has not employed the phrase "bare legal

---

[3]In a case involving § 853(n), we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *See Lester*, 85 F.3d at 1410-11.

title" in § 853(n), but instead used the phrase "legal right, title, or interest." State law principles that determine "legal right, title or interest" may or may not include some formulation of "bare legal title," but we are not free to adopt our own "bare legal title" test as a matter of federal common law.

The "devolution of property . . . is an area normally left to the States," *United States v. Oregon*, 366 U.S. 643, 649 (1961), the transfer of property being a "part of the residue of sovereignty retained by the states, a residue insured by the Tenth Amendment." *United States v. Burnison*, 339 U.S. 87, 91-92 (1950). There are few things as important to the states as to be able to guarantee the integrity of title to real property. *See Warburton v. White*, 176 U.S. 484, 496 (1900) ("Where state decisions have interpreted state laws governing real property, or controlling relations which are essentially of a domestic and state nature—in other words, where the state decisions establish a rule of property—this court, when called upon to interpret the state law, will, if it is possible to do so, in the discharge of its duty, adopt and follow the settled rule of construction affixed by the state court of last resort to the statutes of the state, and thus conform to the rule of property within the state."); *Hervey v. R.I. Locomotive Works*, 93 U.S. 664, 671 (1877) ("[E]very state has the right to regulate property within its limits."). The Court recognized this even in *Swift v. Tyson* when its example of "state laws strictly local" was "rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character." 41 U.S. (16 Pet.) 1, 18 (1842), *overruled on other grounds*, *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

As a practical matter, dual sovereignty does not work with respect to property rights, particularly with regard to the transfer of real property. Were Congress to create a different system, or were we to try to create a federal common law of property ownership in forfeitures, it would risk upsetting settled expectations in property transfer rules in the states. As the

Montana Supreme Court has pointed out, when "[t]he overriding issue is whether the public has a right to rely on the public record," decisions casting doubt on the recording system "would cast doubt as to the validity of every recorded deed and wreak havoc in the county courthouse." *Benson v. Diehl*, 745 P.2d 315, 317 (Mont. 1987). While we have no occasion to consider Congress's power to adopt a national definition of title ownership, we will not read such a definition into the code absent some clear statement from Congress.

**[3]** We thus disagree with the dissent and the Fourth Circuit that we are free to reject "the role of state law," *Morgan*, 224 F.3d at 343, when, irrespective of whether the state would recognize the title, we think the transaction is a sham. We have previously rejected *Morgan's* approach, *Hooper*, 229 F.3d at 820 n.5., and we repeat our disagreement with that decision.[4] Federal forfeiture statutes govern the disposition of property, but state law determines what rights, title or interests the various claimants possess in that property.

## B

**[4]** Under § 853(n)(6)(A), the relevant inquiry is whether, under Montana law, Victoria established by a preponderance of the evidence that legal right, title, or interest in the 414 and 1102 properties vested in her, rather than in Victor, at the time of the commission of the crimes for which Victor was convicted.[5] *See* 21 U.S.C. § 853(n)(6)(A). We begin with the

---

[4]The Fourth Circuit itself recognized that our decisions in *Lester* and *Alcaraz-Garcia* might be inconsistent with *Morgan*, because we "analyzed the question of whether a § 853(n) petitioner has a property interest by determining ownership under state law." *Morgan*, 224 F.3d at 343. In addition, the Sixth Circuit noted the divide between *Morgan* and our decisions. *See United States v. O'Dell*, 247 F.3d 655, 680 n.9 (6th Cir. 2001) ("[O]ther courts have consistently applied relevant state law in determining whether a third party has such a property interest. *See, e.g.*, *United States v. Hooper*, 229 F.3d 818, 820 n.5 (2000) (expressly rejecting the test used in *Morgan*).").

[5]The superseding indictment charged Victor with criminal acts as early as July 11, 1997. Although the government introduced some evidence that

obvious: Victoria has record title to the 414 and 1102 properties, and Victor has never held record title to either property. The evidence presented at the ancillary hearing established that Victoria had title to both properties and that she acquired title before July 11, 1997, the earliest date of Victor's charged offenses.

[5] Montana presumes that a person possessed of the record title is the lawful owner. *See* MONT. CODE ANN. § 70-19-404 (in an action for adverse possession, "the person establishing a legal title to the property is presumed to have been possessed thereof"); *Luloff*, 906 P.2d at 192 ("possession which is *not* adverse can be overcome by any record owner who has acquired title to the land by conventional means," the "two historically recognized ways to acquire unassailable fee title" being transfer and gift). Under Montana law, a party who duly records a deed in the appropriate registry prevails against subsequent purchasers or encumbrancers. *See* MONT. CODE ANN. § 70-21-304; *Kossel v. Stone*, 404 P.2d 894, 896 (Mont. 1965) ("Under our recording statutes, [recorded deeds] constituted constructive notice of their contents to subsequent purchasers."); *Hastings v. Wise*, 8 P.2d 636, 638-39 (Mont. 1932); *see also Kirgan v. Kirgan*, 207 P.2d 557, 559 (Mont. 1949) (" 'A person, in dealing with another in respect to real estate, may rely on the record title to the property, in the absence of actual knowledge of the title in fact, or of facts sufficient to put him on inquiry in respect thereto' ") (quoting 45 AM. JUR. *Records and Recording Laws* § 82 (1946), *now found at* 66 AM. JUR. 2d *Records and Recording Laws* § 83 (2004)). As Victoria's

---

Victor's crimes actually began much earlier, perhaps as early as 1991, the district court specifically instructed the jury that these crimes were "previously committed," "not charged here," and admitted under FED. R. EVID. 404(b) to show only "intent, motive, opportunity, preparation, and knowledge." Moreover, the alleged earlier crimes cannot trigger forfeiture, because Victor was not convicted of these offenses. Only properties involved in criminal violations for which a defendant is convicted are subject to forfeiture. *See* 21 U.S.C. §§ 853(a)(1), (2).

name appears on the recorded deeds, she holds legal title to the properties and is, for various purposes, denominated the "owner" of the properties. *See, e.g.*, MONT. CODE ANN. § 7-12-1103(7) (defining "owner" for business improvement districts as "a person in whom appears the legal title to real property by deed duly recorded in the county records . . . ." ); *Id.* § 85-9-103(10) (defining "owner" for water conservancy districts as "the person or persons who appear as owners of record of the legal title to real property according to the county records whether such title is held beneficially or in a fiduciary capacity . . . .").

Victoria's legal title does not end our inquiry, however. If state law would recognize an "actual" owner over a "straw" or "nominal" owner, then we must inquire whether Victoria was a mere nominal owner and Victor the actual owner of the 414 and 1102 properties. *See United States v. O'Dell*, 247 F.3d 655 (6th Cir. 2001) (holding under Tennessee law that defendant's rights to a property were extinguished because defendant did not pay the mortgage interest and the warranty deed on the property was re-acquired by another party); *United States v. Alcaraz-Garcia*, 79 F.3d 769 (9th Cir. 1996) (holding under California law that appellants retained dominion and control over the property and could have reclaimed their property). Montana courts have recognized that "dominion and control" is the essence of ownership and not "bare legal title." *Safeco Ins. v. Lapp*, 695 P.2d 1310, 1312 (Mont. 1985) (citing *National Farmers Union Property & Cas. v. Colbrese*, 368 F.2d 405 (9th Cir. 1966)); *see also Kranjcec v. Behnak*, 132 P.2d 150, 152-53 (Mont. 1942); *Hayes v. Moffat*, 271 P. 452, 454 (Mont. 1928); *Earl v. Benger*, 20 P.3d 788, 791 (Mont. 1918).[6]

---

[6]We have observed the " 'possession of mere legal title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture.' " *United States v. One Parcel of Land*, 902 F.2d 1143, 1444 (9th Cir. 1990) (per curiam) (quoting *United States v. A Single Family Residence*, 803 F.2d 625, 630 (11th Cir. 1986)). The government has not challenged Victoria's standing.

**[6]** Montana has, by statute, recognized two trust doctrines —resulting and constructive trusts—that allow parties to pierce the veil of apparent, recorded title to real property. *See In Re Estate of McDermott*, 51 P.3d 486, 490 (Mont. 2002). Under the "purchase money resulting trust" doctrine, "[w]here a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person who paid the purchase price." MONT. CODE ANN. § 72-33-218(1). The resulting trust does not arise, however, if the transferee is a spouse or child unless it can be shown that "the party paying the purchase price manifested an intention that the transferee should not have the beneficial interest in the property." *Id.* § 72-33-218(2)(b), (3). Thus, where a father placed property in his son's name but located, negotiated and paid for the property; paid all insurance and property taxes; and took exclusive possession of the property, a resulting trust arose, and the father was the lawful owner. *Hilliard v. Hilliard*, 844 P.2d 54 (Mont. 1992). In general, however, a transfer from a parent to child or from spouse to spouse is presumed to be a gift, and not a resulting trust, and can be overcome only by clear and convincing evidence. *Id.* at 58; *Platts v. Platts*, 334 P.2d 722, 727 (Mont. 1959); *Dial v. Dial*, 310 P.2d 610, 612 (Mont. 1957). *See also Luloff*, 906 P.2d at 192 (transfer and gift are the "two historically recognized ways to acquire unassailable fee title").

The "constructive trust" doctrine "arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it." MONT. CODE ANN. § 72-33-219. Generally, "fraud, accident, mistake, undue influence, and violation of a trust, or other wrongful acts are the bases upon which a constructive trust is found," but a constructive trust may also be imposed "where a title holder innocently obtained title but would be unjustly enriched if they were allowed to retain the title." *In re Marriage of Moss*, 977 P.2d 322, 327 (Mont. 1999). *See also United States v. $4,224,958.57*, 379 F.3d 1146 (9th Cir. 2004)

("[I]t is hornbook law that, when a fraudster acquired property from a victim by fraud, the fraudster holds the property in constructive trust for his victim." (citing SCOTT ON TRUSTS § 462.4 (4th ed. 1989))). "Thus, Montana law no longer requires a showing of fraud or other wrongful acts as a prerequisite to imposing a constructive trust . . . ." *In re Estate of McDermott*, 51 P.3d at 491. Parents who held title to property, advanced the purchase price, and paid the taxes and insurance nevertheless held the property in trust for their son and daughter-in-law who occupied and improved the property and repaid the purchase price. *In re Marriage of Moss*, 977 P.3d at 327. By contrast, no constructive trust resulted when parents held the title and paid all but $1,000 of the down payment, the parties entered into a lease agreement, and the parents had sent their son and daughter-in-law an eviction notice. *In re Marriage of Owen*, 797 P.2d 226 (Mont. 1990).

**[7]** Neither of these trust doctrines favors finding title in Victor.[7] His occasional tax payments, improvements, and illegal activities on the property do not demonstrate his ownership interests. As Montana cases show, it is perfectly consistent with ownership for a parent or other relative to make tax payments, improvements, and even mortgage payments without having a trust imposed on the record title holder. It takes more than anecdotal evidence—indeed, it takes "clear and convincing evidence"—to dispossess a record title holder who has exercised any of the usual privileges of ownership, such as residing on the property, transferring title and taking out a second mortgage, all of which Victoria did.

---

[7]The D.C. and Second Circuits have held that interests imposed in equity, such as constructive trusts, qualify as a "legal" interest under 21 U.S.C. § 853(n)(6)(A). *See, e.g.*, *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1190 (D.C. Cir. 1995); *United States v. Schwimmer*, 968 F.2d 1570, 1582 (2d Cir. 1992).

## C

The district court did not expressly rely on these doctrines, nor has the government urged these doctrines on appeal. Rather, the district court simply rejected the conclusion that Victoria held lawful title. It cited three reasons: (1) the jury at Victor's criminal trial heard the testimony of several witnesses and determined that Victor owned the houses; (2) Victoria "never maintained significant employment, and she demonstrated no means of paying for costs associated with the houses;" and (3) a federal probation officer testified that "Victoria told him that Victor either gave to her or sold her the residence." Since it is not self-apparent that these reasons will support a conclusion that Victoria held the property in a constructive or a resulting trust for Victor, we will examine the facts underlying each reason.

### 1

**[8]** Before turning to the witnesses heard by the jury, we note that the jury at Victor's trial did not decide who owned the properties or held title to or interest in them. Instead, it decided whether the properties were eligible for forfeiture under § 853(a). The special verdict charged the jury to find whether the properties either constituted or derived from any proceeds Victor obtained, directly or indirectly, as a result of his criminal activity, or whether the properties were used, or intended to be used, in any manner or part, to commit or facilitate the commission of his crimes. The special verdict thus determined only whether the properties met the two criteria for forfeiture under 21 U.S.C. § 853(a), rather than who held title to the properties.

The district court expressly drew this distinction in its jury instructions. The court admonished the jurors that the properties "may be held in the name of a person or business entity other than that of the defendant" and that "you should simply disregard any such title or formal claim of ownership." The

court specifically warned the jurors that questions of owner-
ship or title were not before them. "Any interest that another
person may claim to have in such property can be taken into
account later by this Court in imposing sentence and dispos-
ing of the property. This is not for your consideration as
jurors. Stated differently, your sole task is to decide whether
this property, regardless of whose name it is now held, was
derived from or was intended to facilitate the defendant's
drug violations." Thus, contrary to the district court's charac-
terization in its ruling on Victoria's claim, the jury made no
finding as to ownership or title to the properties.

The district court's reliance on the testimony of the wit-
nesses heard by the jury is troubling. As the court character-
ized their collective testimony, without identifying any
particular witness or statement, the witnesses "indicated that
the houses belonged to Victor Nava." We do not know which
of the witnesses' testimony the district court credited, or
whether the district court thought it was bound by the jury's
findings or came to its own conclusion, but the evidence does
not support the district court's conclusion.

The government has cited the testimony of five witnesses
who testified regarding the 414 and 1102 properties. With
respect to the 414 property, one witness, Robert Schaefer, Jr.,
testified that he did some work at the house and that Victor
paid him cash. He also described it as "[Victor's] son's
house," and a place where he had purchased drugs. A second
witness, Sandy Illie, testified that she obtained drugs from
Victor's son, Victor Nava, Jr., at the 414 house. A third wit-
ness, Jeff Holliday, was asked if he was familiar with the 414
house; he answered that it was Victor's house. He did not
explain what basis he had for believing that. He also related
that he had had a conversation at some point with Frank Nava
about one of the properties:

> A. . . . . [Frank Nava] had said something about he
> had a disagreement with Victor because he wasn't

paying the money for it, for him keeping the name in his house [sic].

Q. Victor was not paying [Frank] for keeping the house in his name?

A. Yeah.

Q. And which house was he referring to?

A. I'm not sure which one it was.

Q. Was it one of these three that have been pictured here today?

A. I've got a feeling it's the [414 property], but I'm not sure. I'm pretty sure. That's what my guess would be.

The evidence does not come close to showing that the 414 property was Victor's. The witnesses relied on hearsay, suggested two different owners (Victor and Victor, Jr.), and could not even identify with any certainty which property they were talking about.

There was more testimony with respect to the 1102 property, but the testimony is even more convoluted. Two witnesses testified they had gone to the 1102 house to purchase drugs. One testified that he obtained the drugs from Victor, but he offered no time frame for his activities. Robert Schaefer and Jeff Holliday both testified that they did work at the 1102 house and were paid in cash or drugs; one testified he was paid by Victor, and the other, by Victoria. Holliday identified the 1102 house as Victor's daughter's house and knew that it had belonged to Victor's mother. He later testified that the house was Victor's. "He owns it, but he doesn't live there." When asked if Victor told him it was his house, Holliday equivocated: "Well, he didn't ever tell me it was his

house, I don't think, but I knew it was his because it was his mother's house. He took it over after that." Finally, Jaime Navarez, who was related to the Navas by marriage, testified that he lived at the 1102 house in 1992 and 1993 and paid rent to Victor.[8]

**[9]** There is other evidence that the government introduced at the ancillary hearing that hinted that Victor might actually control the properties, but these suggestions are not enough to surmount the fact that the properties vested in Victoria before the earliest date of the crimes for which Victor was convicted. At the ancillary hearing, the government introduced, over Victoria's objection, the plea agreement that Victor struck with the government and subsequently withdrew. In it, he agreed to forfeit any asset acquired through the proceeds of drug sales and any asset used to facilitate drug trafficking, and he expressly agreed to forfeit the 414 and 1102 properties as included in these categories. Despite Victor's representation to the government that he owned both properties, his assertion of ownership in a plea agreement does not establish legal or equitable title under Montana law. While Montana courts have invoked estoppel to *prevent* a claim of ownership, *see Kauffman-Harmon v. Kauffman*, 36 P.3d 408, 412 (Mont. 2001), Victor's plea bargain representation cannot *establish* his ownership. "[A] defendant's consent to forfeit property does not expand the Court's power over that property, if the property is not the defendant's own," *United States v. Schwimmer*, 968 F.2d 1570, 1580-81 (2d Cir. 1992), for the obvious reason that he cannot agree to forfeit property that belongs to someone else.

**[10]** None of this testimony concerning the 414 and 1102 properties, whether considered individually or collectively, demonstrates that Victor is the owner of the properties. It is

---

[8]That time period is irrelevant because it is both prior to the time that Victoria acquired title to the property and before the crimes charged against Victor.

anecdotal, unclear, and contradictory. The testimony, insofar as it relates to his ownership, is pure hearsay, at best. It may not even rise to the level of hearsay. It is common practice to refer to "my house" or "my apartment" even though one is a leaseholder, renter or boarder; the statement is not to be understood in its technical, legal meaning, but as a familiar way of indicating where one may be found. It is not surprising that these witnesses testified that they thought it was "Victor's house." But this of itself proves nothing. Even if Victor might have been found at these properties from time to time, arranged for their repair and dealt drugs from them, the statements from these witnesses do not show that he controlled the properties in the sense demanded by Montana law. Moreover, most of the statements have no time frame, so we cannot determine whether the events in question occurred prior to 1996, when Victoria acquired title to the properties, or even 1997, which is the earliest date of the acts for which Victor was charged.

2

The district court's general observation concerning Victoria's ability to maintain the houses is equally misplaced. Victoria testified that she was unemployed during much of the time she held the title to the houses, but she also testified that she had three children five years of age and under, and her husband testified that he had been employed. Moreover, she acquired both properties by gift so that, apparently, there was no mortgage to pay until she and her husband borrowed against the 1102 property to pay for Victor's attorneys fees; even then, Joseph testified that they were paying on the loan.

**[11]** There is evidence that Victor made tax payments and some improvements on the properties. Victoria herself testified that her father had made several tax payments for them. This has been addressed in Montana law. Occasional payments on behalf of another—without some additional evidence of the intent of the parties—do not create a resulting or

constructive trust. *See Neset v. Fifer*, 942 P.2d 712, 714-15 (Mont. 1997) (holding that a party's payment of property taxes and claim of the income tax deduction "is not conclusive as to whether a purchase money resulting trust exists"). Nothing in Montana law suggests that lack of employment or inability to pay creates a resulting or constructive trust in favor of the family member making those payments. To the contrary, Montana courts have been reluctant to recognize implied trusts based on the fact that parents had assisted a child with a down payment, mortgage payments, taxes and insurance. *See In re Marriage of Moss*, 977 P.2d at 327; *Neset*, 942 P.2d at 714-15.

3

**[12]** Finally, the district court placed great weight on the testimony of federal probation officer Steven Willis, who testified at the ancillary hearing that Victoria told him that Victor either gave her or sold her the 1102 property where she resides with her husband and children. The district court credited Willis's testimony and found Victoria's testimony not credible because "[w]hen asked if she knew her father to be a drug dealer, she testified she did not. Given Victor Nava's reputation in the community, the Court finds this answer implausible." Given the overwhelming evidence of Victor's drug activities, we accept the court's finding that Victoria's denials are implausible, but her lack of candor regarding her father's drug dealing cannot controvert the indisputable facts supporting her ownership of the property. More importantly, Willis's testimony does not show that Victor is the owner of the property. Willis testified as follows:

> I spoke with Victoria, and she indicated — I asked her how it was going with that. And she indicated she thought they may be able to keep their place. That she owned the place. And she had gotten the place, I'm a little hazy whether she said she bought it from her dad or he had given it to her.

On cross-examination, Willis admitted that he made notes of the conversation but that his "*notes say she indicated the residence was hers*." He repeated that he couldn't remember how she said she acquired it. Willis's "hazy" recollection provides no basis for concluding that Victor owned the property and is contradicted by his own notes. Indeed, neither of the suggested means by which she acquired the property—purchase or gift from her father—bears on the offered evidence of the chain of title, nor does it correlate with any other facts elicited at the trial or the hearing. And the government provided no evidence to show that Victoria's cousin, Frank Nava, or her grandmother, Jessie Nava, were not the actual owners of the properties they conveyed to her.

### D

The dissent argues that federal courts must look beyond a claim to legal title to discern ownership and that straw owners may not reclaim property subject to forfeiture. Dissent at 4253-54 & nn.7-8. Even if we could accept the dissent's "bare legal title" test as a matter of federal common law, we could not conclude that Victor had better title under federal precedents. The cases cited by the dissent divide themselves into two patterns. In the first line of cases the defendant once held the title and then transferred his title to a nominal owner. *See, e.g.*, *Totaro*, 345 F.3d at 996-99 (wife acquired title from defendant-husband; he represented himself as the owner and used the property as collateral for loans; proceeds from defendant's unlawful activities went into wife's account from which property-related expenses were paid; applying New York law);[9] *United States v. Ben-Hur*, 20 F.3d 313, 314-15,

---

[9]Notwithstanding the overwhelming evidence that the defendant was the "actual owner," the Eighth Circuit was "reluctant to declare [the wife] a mere straw or nominal owner" where she exercised some dominion and control over the property by living in the house. *Totaro*, 345 F.3d at 996. The court ultimately declared the property forfeitable, but on the theory that the defendant's unlawful proceeds paid for the "considerable mortgage." In the end the court directed the district court to determine the wife's and defendant-husband's respective interests in the property under New York State divorce law. *Id.* at 999.

318 (7th Cir. 1994) (defendant divested himself of legal title, but continued to pay "all licenses, utilities, maintenance and repairs, insurance, and taxes"; applying Wisconsin law, the court concluded that defendant retained all "ownership 'sticks or rights' other than bare legal title") (citation omitted); *Braxton v. United States*, 858 F.2d 650, 654-55 (11th Cir. 1988) (defendants gave the nominal owner a warranty deed "as federal law enforcement authorities were closing in on the [defendants]"; transaction was "an absolute sham"). In the second line of cases, the defendant never held title to the property, but the nominal owner also never exercised dominion and control over the property. *See, e.g.*, *Morgan*, 224 F.3d at 343-44 (spouse named on checking account was "no more than a mere name on the account, with no power over the disposition of the account funds"); *United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 604 F.2d 27, 29 (8th Cir. 1979) (defendant supplied purchase money for aircraft, but registered it in co-conspirator's name "as a subterfuge"; defendant used a blank bill of sale from the registered owner as collateral for a bank loan).[10] Here, neither of these criteria is present: Victor never held title to the properties, and Victoria has exercised the obvious and traditional right of ownership by exclusively occupying the property. The dissent can cite no case in which a court awarded ownership to someone who never held title and did not live on the property, in preference to the titled owner who occupied the property.

---

[10]The unpublished Sixth Circuit case the dissent calls "quite similar" on its facts is, in fact, not similar at all. In *United States v. Warner*, 968 F.2d 1217, 1992 WL 163258 (6th Cir. 1992) (per curiam), the court found that the record owners purchased the property at the request of the defendant and for her use and benefit; moreover, "the property had actually been purchased and the mortgage payments and taxes had been paid by defendant." *Id.* at **3.

## E

**[13]** In sum, Victoria demonstrated by a preponderance of the evidence that she holds legal title to the 414 and 1102 properties. She has exercised nearly continuous possession of the 1102 property with her husband and children. Although Victor made some tax payments on her behalf and may have conducted some activities, lawful and unlawful, on the 1102 property, the evidence falls well short of demonstrating the kind of "dominion and control" necessary to defeat her title under Montana law. Similarly, with respect to the 414 property, there is insufficient evidence to show Victor's control of that property. Again, he may have conducted some activities on the property, but he does not live there and does not control the property.[11] The government has not offered any proof that Victor paid the purchase price for either of the properties on behalf of Victoria. Victoria received the deeds of both properties as gifts (and paid consideration of one dollar for each of the properties), but there is no showing by the government that Victor paid for the property or arranged for the gift or otherwise manipulated the system to disguise his real ownership of the property. Nor has the government shown that Victoria will be unjustly enriched by retaining her interest in the property. The facts will not support a claim that Victoria held the property as a resulting or constructive trust for Victor and, thus, Victor has never owned these properties in any sense recognized by Montana.

We recognize that it is possible that Victor "gamed the system" by encouraging transfer of the 414 and 1102 properties from his mother, Jessie, to his nephew, Frank, to his daughter, Victoria. If so, then Victor misjudged his right to control the property; with title go privileges and liabilities that give rise to predictable risks. When Victoria acquired title to the property and began exercising the rights that go with titled owner-

---

[11]By contrast, Victor held title and resided at the 317 property, which is not at issue here.

ship, she assumed certain legal risks. She assumed liability for the taxes owed on the property. She assumed the risk for failing to clear the sidewalks of snow and ice, for not maintaining the property, and for observing any zoning restrictions. It is nearly unthinkable that if the city had approached her about any of these problems that she could have interposed the defense that her father really "owned" the property and he should be liable. By not acquiring lawful title for himself, Victor too assumed legal risks. He assumed the risk that Victoria would die, and that her property would pass to her lawful heirs. He assumed the risk that Victoria would exercise the privilege of ownership and would convey the property to someone else, including a bona fide purchaser; or that she would remodel the house or take out a second mortgage for her own use. Others, not a part of the Nava family, assumed risks based on Victoria's apparent ownership as well. The bank, relying, evidently, on the recording laws and Victoria's proof of occupancy, issued a second mortgage to Victoria.

We must "heed[ ] the Supreme Court's recent admonition that '[i]mproperly used, forfeiture could become more like a roulette wheel employed to raise revenues from innocent but hapless owners . . . , or a tool wielded to punish those who associate with criminals, [rather] than a component of a system of justice.' " *Lester*, 85 F.3d at 1413 (quoting *Bennis v. Michigan*, 516 U.S. 442, 456 (1996) (Thomas, J., concurring)). We doubt that there is any other context in which Victoria's ownership might be pitted against Victor's in which we would conclude that Victor is the rightful owner of the 414 and 1102 properties. For example, if Victoria had been charged with drug activity, the government might well have sought the forfeiture of her property; and if Victor had come forward to claim that the property was really his—even though he didn't have title and had never lived there—there is little doubt that we would dismiss his claim as nearly frivolous.

The dissent, the district court and the government have in reality proceeded on the belief that this is a bad family and

that there are nefarious things going on at these properties. There appears to be ample evidence to support this. Indeed, there is even evidence that, if believed, suggests that Victoria herself was involved in illegal drug activities on these properties. The government is not without remedy. It may have grounds for a civil forfeiture action—an action *in rem*—against the property. *See* 21 U.S.C. § 881. Or it may have grounds for a criminal action against Victoria which, if successful, might result in criminal forfeiture under § 853. But the government may not declare property forfeit on the transparent claim that these properties were really Victor's.

## III. CONCLUSION

The district court erred in holding that Victoria failed to establish by a preponderance of the evidence that she had a legal right, title or interest in the 414 and 1102 properties. In light of our disposition, we do not address whether Victoria was a bona fide purchaser for value. *See* § 853(n)(6)(B). The judgment of the district court is reversed and remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

RYMER, Circuit Judge, dissenting:

I part company with the majority because I do not believe that forfeiture pursuant to 21 U.S.C. § 853 turns on who holds bare legal title. Otherwise, forfeiture could always be avoided by putting property in the name of a nominee. Recognizing that § 853(o) imposes upon us the obligation to construe § 853 liberally, I would hold that property of a defendant whose title is held by a straw or nominal owner may be forfeited.

I also part company with the majority's suggestion that, when the claimant to forfeited property holds bare legal title,

the burden shifts to the government to show that the property is held as a resulting or constructive trust for the defendant pursuant to state law. Section 853(n)(6)(A) in plain language puts the burden on *the petitioner* to show by a preponderance of the evidence that the petitioner's right, title or interest was vested in the petitioner rather than the defendant. Absent particular circumstances warranting it (and here, absent any facts or argument justifying it), there is no reason for the validity of the petitioner's alleged interest in the property to turn on the state law of trusts. Instead, when the character of the interest is uncontroverted, the only question is whether that interest is subject to forfeiture.

Thus, I would hold that Victoria Nava was required to prove that she held title to 414 South 25th Street (414) and 1102 South 28th Street (1102) for herself rather than for Victor at the time Victor committed the acts that gave rise to forfeiture. Following Victor's trial and an evidentiary hearing on Victoria's petition, the district court found that Victoria was not credible and that she had not established that the right, title or interest in either house was vested in her rather than Victor. The trial court's credibility findings are entitled to deference, and its findings of fact are well supported given evidence that Victor paid taxes on these properties as well as others held by other people; repairs were done at his behest and at his expense; Frank Nava (Victor's nephew who transferred 414 and 1102 to Victoria) held properties for Victor; 414 and 1102 came to be in Victoria's name on the same date although for ostensibly different reasons; Victoria and her husband had no visible means of lawfully maintaining the properties; and they took out a $33,000 mortgage on 1102 to defray Victor's legal expenses. I would, therefore, affirm.

I

Victor Nava, Sr. was indicted on November 20, 2000 for conspiracy to distribute dangerous drugs and possession with intent to distribute them on or before June 11, 1997. After he

was convicted, the jury returned a special verdict of forfeiture against several pieces of property including 414 and 1102.[1] The court held an ancillary hearing when Victoria claimed that the properties belonged to her. Fed. R. Crim. P. 32.2(c)(1); 21 U.S.C. § 853(n)(2).

There was never any question that Victoria held title to the two houses; the whole purpose of the hearing was to allow the introduction of testimony and exhibits so that the trial judge could determine whether the properties were really Victor's, or Victoria's. Victoria did not prove that she was a bona fide purchaser for value, as she paid one dollar for one of the houses and was given the other. 21 U.S.C. § 853(n)(6)(B). Therefore, she had to establish a legal right, title or interest that rendered the forfeiture order invalid because it was vested in her, rather than Victor, or was superior to Victor's right, title, or interest, when he was dealing drugs. *Id*. § 853(n)(6)(A).

The evidence shows that Victoria received warranty deeds from Frank Nava for both 414 and 1102 on April 11, 1996.[2] She testified that Frank gave her the 1102 house because he had received it from their grandmother who wanted Victoria to have it when she turned eighteen, and that Frank gave her the 414 property to prevent his wife from acquiring it in a divorce. However, Victoria had previously told a federal probation officer assigned to a case involving her husband that she received 1102 as a gift from Victor.

---

[1] Under the instructions, the jury had to find that Victor's property (specifically including 414 and 1102) was acquired with proceeds of, or was used to commit or facilitate commission of, the drug-trafficking offenses of which he was found guilty, whether or not the property was held in someone else's name.

[2] The chain of title shows that Frank Nava also recorded quit claim deeds to 414 to Victoria on January 20, 1998 and June 15, 1998. This would, of course, have been unnecessary had Victoria's title truly been vested in her (rather than in Frank as Victor's nominee) on April 11, 1996.

Tax receipts indicate that Victor paid cash for overdue property taxes on both houses for the tax year 1998. The receipts show that taxes were paid from 1992 forward, but not who paid them. Victoria claimed that she paid Victor back, but her husband contradicted this. Victoria was not gainfully employed except for a few months in 2000 or 2001 when she earned no more than a thousand dollars for the year. She testified that her husband paid the taxes, but he was incarcerated from 1997 through early 2000.

Robert Schaefer testified that Victor arranged for Schaefer to do remodeling work and yard clean-up on both houses, and that Victor paid him for the work. Victor purchased the building supplies. Jeff Holliday also did work for Victor on 1102. He stated that the house used to belong to Victor's mother, then Victor had taken ownership from her "but he doesn't live there." Holliday testified to a conversation he overheard between Victor and Victor's nephew, Frank Nava, in which Frank and Victor argued over Victor's failure to pay Frank for his "service" of holding title to Victor's property in his name. Another witness testified that he lived in the 1102 house and paid Victor rent. He also stated that Victor had refused to provide him a receipt for the rent because the house was held in someone else's name. Bill Keene testified that he owned property at 414 which he sold to Victor Nava, Sr. for $2000 in cash; however, the deed was placed in the name of Victor Nava, Jr. and was never recorded. Victor paid taxes on this property.

Both houses were used to distribute drugs. Jeff Holliday testified that he had sold "crank" to Victoria at 1102. Laura Ison testified that Victor sent her to both houses to obtain drugs. Sandy Ilie testified that she went to 1102 for drugs between 1996 and 1999 and that she obtained drugs from Victor Nava, Jr. at 414.

Ison testified that Victor invited her to live at 414. Rudy Lucero lived at 414 for a couple of years when the property

was in Victoria's name, but Victoria received no rent from him.

Victoria lived at 1102 for some of the time after the deed was recorded in her name in 1996. She and her husband, Joseph Reyna, took out a mortgage in the amount of $33,000 on April 4, 2001. She executed a warranty deed on 1102 to Reyna and herself as joint tenants on April 19, 2001. All of the proceeds of the mortgage except what was necessary to pay loan expenses went to pay Victor's legal fees. There was no expectation that he would pay the money back.[3]

The district court explicitly found credible the probation officer's testimony that Victoria had told him that Victor gave or sold 1102 to her, and the court found Victoria was not credible.[4] The court concluded that Victoria had failed to show that the right, title or interest in either house vested in her rather than Victor, or that her interest in the houses was superior to Victor's.

---

[3]The district court admitted Victor's written plea agreement (signed September 25, 2001 but later withdrawn) in which he acknowledged that 414 and 1102 were the proceeds of, or were used for, his drug-trafficking crimes that he would forfeit. He also agreed to do whatever was necessary to pass clear title, including for property held or controlled by a nominee. Victoria appeals the admissibility of the agreement, but it is not necessary to resolve the issue because the district court did not rely on Victor's admissions for its decision.

[4]This finding is based in part on disbelieving Victoria's denial of knowledge about Victor's drug trafficking. The court also found testimony of Frank Nava and Joseph Reyna to the same effect implausible. Victor was known in the community as a drug dealer. Also, there is evidence that Holliday sold "crank" to Victoria at the 1102 house; that Sandy Ilie arranged between 1996 and 1999 for a third party to acquire drugs from "one of Victor's daughters" living in the 1102 house; and that Laura Ison sometimes acquired drugs from Joseph Reyna, Victoria's husband, who told her that the drugs came from Victor.

II

Victoria argues that the district court's approach was flawed because criminal forfeiture cannot cause the forfeiture of property not owned by the defendant. She contends that she received both houses by direct deed from her cousin Frank Nava, and never received either from Victor, directly or indirectly. Victoria also submits that it was clear error for the district court to conclude that she failed to show a legal right to the property, as the titles of record establish that she was deeded both properties in 1996.

Victoria's contentions necessarily fail as to 1102 because the district court explicitly found that this residence came from Victor. Her contentions equally fail as to 414 given the court's adverse credibility determinations as to Frank Nava as well as Victoria. This leaves no evidence credited by the trier of fact that Victoria received either property as a gift from Frank, and substantial evidence that Victor exercised dominion and control over both properties. The only possible conclusion on this record is the one reached by the district court, that Victoria failed to carry her burden of showing that she held title for herself rather than for Victor.

Victoria has never argued that there is anything about Montana law that affects the analysis. I would not venture there, as the majority does. First, the path is uncharted, unbriefed, and unvetted. Even more importantly, there is no issue in this case about the nature of the petitioner's alleged interest that requires resort to state law.[5] The character of Victoria's interest has never been in dispute: she had legal title that was free and clear except for occasional transfers to a bonding com-

---

[5]In particular, there is no issue here about Victoria's right, title or interest vis-a-vis a subsequent purchaser or encumbrancer, or an adverse possessor, from whence the Montana presumption relied upon by the majority — that the person who possesses record title is the lawful owner — arises.

pany and the mortgage she took out for Victor's legal fees. Her position has always been that the title is truly hers, not Victor's, because it came from Frank. However, the district court determined that this was not so.

Under the law of this circuit, ownership interests (such as community property) are defined under state law while the federal forfeiture statutes determine whether those property interests must be forfeited to the government. *See, e.g.*, *United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir. 1996); *United States v. Alcaraz-Garcia*, 79 F.3d 769, 774 (9th Cir. 1996). Here the ownership interest is legal title. The question is whether that interest may be forfeited. I believe this is a matter of federal law, and that the answer is yes, an interest based upon bare legal title may be forfeited if the title is held in name only.

The Fourth Circuit so held in a § 853(n) proceeding in *United States v. Morgan*, 224 F.3d 339 (4th Cir. 2000). In *Morgan*, the defendant's assets were forfeited to the United States when he was convicted of drug dealing. The defendant's wife petitioned to set aside the forfeiture of a certificate of deposit and a checking account. She asserted that neither was the property of the defendant under § 853 because she had a property interest in both that was superior to her husband's. The court found it unnecessary to consider the role of state law in these circumstances given the intent of Congress in enacting the forfeiture provisions of § 853. As it explained:

> The intent of Congress in enacting the forfeiture provisions of § 853 was to "strip these offenders [racketeers and drug dealers] and organizations of their economic power." S.Rep. No. 225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3374. Therefore, Congress noted that § 853(n)(6) "should be construed to deny relief to third parties acting as nominees of the defendant or who knowingly engage in sham or fraudulent transactions." S.Rep. No. 225, *supra* at

3392 n.47. In order to effectuate the legislative purpose of the statute, courts must evaluate whether the petitioner is a nominee when reviewing the substance of a § 853(n) claim.

*Id*. at 343 (alteration in original). The court further reasoned that "[f]ailing to look beyond bare legal title or whether the petitioner has a property interest under state law would foster manipulation of ownership by persons engaged in criminal activity." *Id.* Accordingly, based on evidence that the checking account was used to facilitate the defendant's drug activity, that Mrs. Morgan had no idea about the logistics of the transactions involved in opening the account, that the defendant had acquired other properties in her name but she knew little or nothing about them, that the certificate of deposit was bought with the defendant's funds, and that Mrs. Morgan did not draw upon these assets, the court affirmed the district court's conclusions that the checking account and certificate of deposit were subject to forfeiture because Mrs. Morgan exercised insufficient dominion and control over them and her name on the accounts was merely nominal. *See also United States v. Ben-Hur*, 20 F.3d 313 (7th Cir. 1994) (noting that the purpose of § 853 is not just to punish illegal conduct but to strip drug dealers of their economic power, and holding that properties in a third party's name are forfeitable when, among other things, the defendant acted as if he retained ownership after entering into land contracts); *Braxton v. United States*, 858 F.2d 650, 654-55 (11th Cir. 1988) (forfeiting property under the RICO statute, 18 U.S.C. § 1963(*l*)(6)(A), which is identical to § 853(n), when third party held title through a warranty deed from defendant as a nominee); *United States v. Totaro*, 345 F.3d 989, 996 (8th Cir. 2003) (recognizing that bare legal title is insufficient to prevent forfeiture under the RICO statute when property in which a spouse might otherwise have an interest is acquired with RICO proceeds because "[i]t would do a severe disservice to the intent and purpose of the RICO forfeiture statute if a criminal were able to protect

and enjoy RICO proceeds by investing them in property titled to a spouse.").[6]

I agree with this analysis. It is consistent with the text of the statute, and with what we, and other circuits, have said in other forfeiture contexts. The whole point of § 853(n)(6)(A) is that a person who holds legal title to property has to show that it is truly hers rather than the convicted felon's.[7]

While we have not directly held that a straw owner holding nominal title may not invalidate a forfeiture order under § 853, we have held that a nominal owner lacks standing to claim return of property that was forfeited pursuant to 21 U.S.C. § 881. *United States v. One Parcel of Land*, 902 F.2d 1443 (9th Cir. 1990) (per curiam); *United States v. Vacant Land*, 15 F.3d 128 (9th Cir. 1993). In *One Parcel of Land*, for example, the claimant was listed as the title owner but he presented no documentary evidence regarding his finances or payments with respect to purchase of the property, and he claimed he paid property taxes but had no record to support it. In these circumstances, we upheld the district court's determination that the claimant had failed to meet his burden of proving more than nominal ownership. It follows that we should uphold the district court's determination here that Vic-

---

[6]The Sixth Circuit considered the issue so straightforward that it affirmed rejection of a claim on facts quite similar to those now before us in an unpublished disposition. *See United States v. Warner*, 968 F.2d 1217, 1992 WL 163258 (6th Cir. 1992) (per curiam) (unpublished table decision) (concluding that under § 853(n) "in spite of the fact that the normal indicia of legal ownership, the deed, indicated that [the petitioners] had a legal interest in [the property], they were in reality nothing more than the nominal legal owners of the property."). *Id*. at **3.

[7]This being so, I do not see how the validity of an order of forfeiture has anything to do with whether state law "would recognize an 'actual' owner over a 'straw' or 'nominal' owner." Maj. op. at 4232. For purposes of criminal forfeiture, federal law already assumes the possibility of nominal ownership and provides a procedure for determining it.

toria failed to meet her burden of proving more than nominal ownership.[8]

Given the majority's contrary conclusion, it bears repeating that § 853 imposes the burden of proof on Victoria, not on the government.[9] Without actually saying so, the majority appears to shift the burden by invoking the Montana presumption that the title holder of record owns the property (at least vis-a-vis subsequent purchasers or adverse possessors); ruling that Montana trust law applies; and faulting the government for failing to show that Victor paid the purchase price for the properties in behalf of Victoria, that he arranged for the gift of the properties or otherwise manipulated the system to dis-

---

[8]Other circuits also look through bare legal title to whether the holder is a straw or nominal owner when considering third party claims in other forfeiture contexts. *See, e.g.*, *United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001) (holding in the context of civil forfeiture that courts must look beyond bare legal title to determine whether the record title owner is a strawman); *United States v. 526 Liscum Drive*, 866 F.2d 213, 217 (6th Cir. 1989) (holding in a § 881 proceeding that claimant holding legal title must prove indicia of true ownership to demonstrate she was not a nominal or straw owner), *abrogation on other grounds recognized by United States v. Certain Real Property Located at 16510 Ashton*, 47 F.3d 1465 (6th Cir. 1995); *United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 604 F.2d 27, 28-29 (8th Cir. 1979) (indicating that bare legal title may be insufficient to establish ownership in a § 881 forfeiture challenge).

[9]Section 853(n)(6) provides in this respect:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; . . .

the court shall amend the order of forfeiture in accordance with its determination.

guise his real ownership, or that Victoria will be unjustly enriched by retaining her interest in the properties. However — and without regard to how Montana courts would treat the problem — this construct cannot comport with § 853, which squarely places the burden of proof on the petitioner.[10]

In sum, we are obliged to construe the provisions of § 853 liberally to effectuate its remedial purposes. 21 U.S.C. § 853(o).[11] To allow straw owners to defeat forfeiture would defeat the statute's prime remedial purpose: to strip drug traffickers of their economic power. I would therefore hold that to prevail in a § 853(n) proceeding, a petitioner holding legal title must prove by a preponderance of the evidence that the title vests in her truly, not nominally.

While any one of us might have measured the witnesses' credibility or found the facts differently in this case, I am not firmly convinced that the district court got either wrong. It is implausible that Victoria came to hold title to 414 and 1102 on the same day because her grandmother wanted her to have 1102 when she turned eighteen and because Frank wanted to give 414 to her to hide it from his wife. There was a conflict in testimony about whether Victoria got 1102 from her grand-

---

[10]Victoria makes the different point that allocating the burden to petitioners and including the trial record in a § 853(n) proceeding offends due process. However, § 853(n)(5) specifically allows for consideration of relevant portions of the trial record in an ancillary proceeding; Victoria offers no authority, and no basis in the record of the ancillary proceeding, in support of her argument that she lacked opportunity to cross-examine witnesses whose testimony was offered for the court's consideration. Section 853(n)(6) also specifically prescribes the burden of proof (preponderance of the evidence) and places it on the petitioner. This is not inconsistent with *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), the only authority upon which Victoria relies.

[11]Section 853(o) states:

Construction

The provisions of this section shall be liberally construed to effectuate its remedial purposes.

mother via Frank (as she testified) or from Victor (as the probation officer testified she previously represented); who is telling the truth is for the district court to decide, not us. Victor used Frank Nava (and others) to hold property for him, so the district court could reasonably infer that Victor used Frank to hold (and transfer) 414 and to deed 1102 to Victoria as a subterfuge. Victor treated both premises as his own: he arranged and paid for repairs; he invited a friend to live in one of the houses; he rented them out and received the rental payments; he paid taxes on these and other properties that were titled to others; he was the sole beneficiary of the proceeds of a mortgage on 1102; and he used both places to deal drugs before, during, and after title was recorded in Victoria's name.

There is no evidence credited by the trier of fact that Victoria received either property as a gift from Frank — which was her only claim — and substantial evidence that Victor exercised dominion and control over both properties. The only possible conclusion on the record is the one reached by the district court: that Victoria failed to carry her burden of showing that she held title for herself rather than for Victor. Accordingly, I would affirm.