# United States Court of Appeals
## For the First Circuit

No. 03-1937

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL MARKS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Lynch, Lipez and Howard,
Circuit Judges.

Joseph H. Groff, III, with whom Jensen, Baird, Gardner & Henry was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

April 30, 2004

**HOWARD**, <u>Circuit Judge</u>.  On June 26, 2002, Michael Marks pleaded guilty to numerous charges arising out of his distribution of prescription drugs to acquaintances, primarily troubled teenage girls.  Marks appeals his sentence, alleging that the district court improperly included drugs personally consumed by Marks in its calculation of the total amount of drugs at issue.  We affirm.

## I.  Factual and Procedural Background

The following facts are drawn from the presentence investigation report and transcripts of the defendant's change-of-plea and sentencing hearings.  <u>See</u> <u>United States</u> v. <u>Santos</u>, 357 F.3d 136, 138 (1st Cir. 2004).  Since age 16, Michael Marks had been prescribed powerful medications, including narcotics, to control what his treating doctors believed to be the symptoms of rare neuromuscular diseases.  In September 1998, at age 18, Marks moved out of his mother's home and into his own apartment.  In the period that followed, Marks gave his prescription medications to at least ten minor girls and others in exchange for money, merchandise, companionship and friendship.  In late 2000 and throughout 2001, Maine state police and drug enforcement agents, as well as agents from the U.S. Department of Health and Human Services, investigated Marks's distribution of his medications, all of which were paid for by Medicaid.

In November 2001, Marks was indicted on fifty-eight counts relating to his distribution of prescription medications.

These included three counts of maintaining residences in Mexico, Maine, and Rumford, Maine, to distribute controlled substances (Counts 1-3); fifty-three counts of possession with intent to distribute controlled substances between May 18, 1998, and October 19, 2000 (Counts 4-56)[1]; one count of distributing a controlled substance to a person under the age of 21 (Count 57); and one count of health care fraud (Count 58). In June 2002, Marks pleaded guilty after the government agreed, inter alia, to dismiss six charges of possession with intent to distribute morphine sulfate. As part of his guilty plea, Marks stipulated that, as to the prescriptions for the other drugs at issue in the remaining counts, he "did distribute or intend to distribute to other persons one or more pills from each prescription."

In June 2003, the district court held evidentiary hearings to determine the quantity of drugs Marks possessed with intent to distribute. The government presented the testimony of seven of the defendants' acquaintances, all of whom reported that they had received prescription drugs from the defendant or had witnessed him giving drugs to other people. Collectively, these witnesses described a pattern of drug distribution that began at some point in 1998, and continued at least through the summer of

---

[1]These counts involved six separate drugs: oxycodone (also known by the trade name Roxicet), morphine sulfate (MS Contin or MSIR), hydrocodone bitartrate (Vicodin), dronabinal (Marinol), propoxyphene (Darvocet), and diazepam (Valium).

2000. During this time, Marks dated a string of girls from the local alternative education high school, freely dispensing drugs to them and to their friends on lunch breaks, after school and on the weekends. One former girlfriend, Carmen Trice, testified that Marks gave her fistfuls of pills on hundreds of occasions. Trice recalled one instance in particular when she accompanied Marks to more than one pharmacy in an effort to fill a prescription for morphine sulfate and that, when he was finally successful, he gave her five to ten of the pills. Most of the witnesses reported taking a variety of pills, including Valium, Vicodin, Percocet (a form of oxycodone), and morphine sulfate, but typically could not recall specifics about what they took or when they received particular pills.

Marks's apartment was described as a local hangout where some of the witnesses spent time on a daily basis. Prescription bottles were seen throughout the apartment. Marks would sometimes leave his visitors alone in the apartment, and he did not discourage them from helping themselves to pills (which some of the witnesses did on occasion).

Few of Marks's acquaintances saw him take his own medicine. One of his former girlfriends, Rhonda Welch, testified that she had lived with him for several months at the end of 1999 and the beginning of 2000, and that she saw him take pills very rarely, possibly twice a month. She also testified that, on

-4-

approximately ten occasions, the defendant had gone to the emergency room to get a shot rather than take his medication and that, on these visits, his legs would shake "[w]hile the doctors were in the room." Most witnesses reported that the defendant did not appear to be limited physically, providing specific examples of the defendant walking up and down stairs regularly, moving his furniture in and out of his apartments, shoveling his driveway, and picking up his rottweiler dog.

Marks told two of the witnesses, both young men, that he used the pills to get girls to sleep with him, telling one of them that if you slipped pills into a girl's drink, "you could have all the fun you wanted." This witness, Eric Welch (the brother of Rhonda Welch), also described Marks's reaction when Marks was visited at home by a Maine state police detective. After being interviewed, Marks went through the apartment, collecting pill bottles in a plastic bag. Welch helped by holding the bag while Marks pulled pill bottles "from everywhere," including above the ceiling tiles and in a kitchen drawer. Marks tried unsuccessfully to have a friend keep the bag (which also contained photos of naked girls, a few videotapes and a video camera) at her house.

In addition to Marks's acquaintances, the government presented the testimony of Dr. Brian McCann, an emergency room physician who examined Marks in May 1999. He testified that the nurses who treated Marks noticed that Marks's tremors and spasms

diminished when he did not think he was being observed. In another emergency room visit in March 2001, Marks reported that he had been taking his medication but that it was not controlling his pain. Dr. McCann found Marks's presentations suspicious and ordered a drug test. The test revealed that Marks had not been taking any of his prescribed medications.

The government also introduced the testimony of Dr. Anthony Amato, the chief of the neuromuscular division of Brigham & Women's Hospital in Boston. In March 2002, Dr. Amato examined Marks at the request of his treating physician to determine whether Marks had "stiff person syndrome," an autoimmune disease causing muscle stiffness and spasms. Dr. Amato found that Marks's arms and legs would jerk during the examination, except when Marks was distracted. He concluded that Marks was physically normal and recommended that he cease his prescription medication regimen.

Marks took the stand during the evidentiary hearing. He acknowledged giving away some of his prescription medications but also maintained that he took his pills fairly regularly. He testified that he took his pills in the morning and at night when other people were not around and that he sometimes skipped his afternoon pills because he did not like taking any more medication than necessary. He admitted to giving away a few Percocets but stated that he consumed the vast majority of these pills (a total of 120 pills obtained through a prescription in May 1998 and

another in September 1998). He could not recall giving away any morphine sulfate, the drug that was charged in the six dismissed counts of possession with intent to distribute. On cross examination, Marks acknowledged that he had been told by his probation officer that the charges involving oxycodone and morphine sulfate carried a much higher sentence than the remaining possession with intent to distribute charges. He also stated that he could not recall whether he had denied giving away Valium or Vicodin in an August 2001 interview with an agent of the Department of Health and Human Services. On rebuttal, that agent testified that Marks had in fact denied giving these drugs away and had claimed that his mother controlled his medications.

Marks was sentenced on June 13, 2003. The district court found that the drugs Marks obtained in the period before he moved into his own apartment (namely those prescriptions filled between May 18, 1998 and July 14, 1998) were obtained with the intent that Marks would consume them himself. It therefore excluded the drug amounts described in the first seven possession charges, including half of the oxycodone at issue in the case. The court also found, however, that, beginning in September 1998, Marks's drug purchases were made with the intent that most of the pills would be distributed to others:

> [Marks] obtained the pills as part of a
> unified effort to gain possession of them with
> the intent that any or all of them would be

> available to him for distribution to others as the occasion struck him to do so. These pills were a store of pills, any of which could be distributed, as he wished, from time to time. The possession of them, even if, in fact, some were used by the Defendant on occasion, are, accordingly, to be considered part of the relevant offense conduct since Defendant's possession[] of the two categories of pills are inextricably intertwined with each other.

Memorandum of Sentencing Judgment at 2.

After determining Marks's base offense level for the possession charges based on the drugs obtained between September 1998 and October 2000, the district court concluded that Marks was not entitled to a two-level "safety valve" decrease of his offense level, see U.S. Sentencing Guidelines Manual (USSG) § 2D1.1(b)(6) (permitting a two-level decrease for defendants who satisfy all criteria of USSG § 5C1.2), because the government had reasonably represented that Marks had not satisfied U.S. Sentencing Guidelines § 5C1.2(5). This provision requires a defendant to truthfully provide all information that he has about his offenses. The court also increased Marks's offense level by two levels because his offenses involved minors. See USSG § 3B1.4.

The court made other adjustments to Marks's offense level, including an increase to account for the remaining charges not grouped with the possession with intent to distribute counts and a two-level decrease to reflect Marks's acceptance of responsibility. In denying a third level of reduction on the basis of acceptance of responsibility, the court specifically found that:

-8-

> [Marks] has not been truthful and candid with the Government, the probation officer, or in his testimony before the Court as to the quantities of pills he actually consumed himself and that he has misrepresented those quantities for the deliberate and self-serving purpose of influencing the calculation of the Guideline range in his favor.

The district court sentenced Marks to thirty-seven months' imprisonment and a three-year supervised release term. It waived any fines based on Marks's inability to pay but ordered Marks to pay $1,596.39 in restitution to Medicaid and a special assessment of $4,900.00. This appeal followed.

## II. Analysis

We review the district court's findings of fact for clear error and its legal determinations, including its interpretation of the sentencing guidelines, de novo. United States v. Reyes-Echevarria, 345 F.3d 1, 6 (1st Cir. 2003). At sentencing, the government bears the burden of proving drug quantity by a preponderance of the evidence. United States v. Sklar, 920 F.2d 107, 112 (1st Cir. 1990). The district court may choose between plausible estimates of drug quantity but must "err on the side of caution." Id. at 113.

In determining the quantity of drugs involved in the offense, the district court was entitled to consider "relevant conduct," namely all drugs "that were part of the same course of conduct or common scheme or plan as the offense of conviction."

USSG § 1B1.3(a)(2); see also USSG § 2D1.1, cmt. n.12 ("Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level."). Marks's principal contention on appeal is that the district court erred in including in its quantity calculation all drugs acquired between September 1998 and 2000 without deducting quantities of oxycodone and morphine sulfate that he consumed and therefore could not have been intended for distribution to others.[2] In pressing this argument, Marks contends that all circuit courts that have considered the question have held that drugs intended for personal use should not be included in drug quantity calculations on a charge of possession with intent to distribute. See United States v. Gill, 348 F.3d 147, 153 (6th Cir. 2003); United States v. Williams, 247 F.3d 353, 358 (2d Cir. 2001); United States v. Fraser, 243 F.3d 473, 475-76 (8th Cir. 2001); United States v. Wyss, 147 F.3d 631, 632 (7th Cir. 1998); United States v. Kipp, 10 F.3d 1463, 1465-66 (9th Cir. 1993). But see Fraser, 243 F.3d at 476-78 (Hansen, J., dissenting) (arguing for inclusion of drugs intended for personal use and acquired at the same time as drugs intended for distribution); United States v. Jansen, 218 F. Supp. 2d 639 (M.D. Pa. 2002) (similar).

---

[2]Although Marks has not admitted possessing with intent to distribute all of the other four drugs (approximately 2,400 pills) identified in the indictment, these pills have relatively little effect on sentencing, unlike the oxycodone and morphine sulfate.

Marks's invocation of this split of authority is a red herring. The district court did not find that any of the drugs Marks acquired in or after September 1998 were possessed with the intent that they would be personally consumed. Instead, as set forth above, the court made a contrary finding: that the pills were "obtained . . . as part of a unified effort to gain possession of them with the intent that any or all of them would be available for distribution to others . . . ." In other words, the court found that each and every pill Marks acquired in or after September 1998 was acquired with the intent that it would or could be distributed. In our view, this finding differentiates this case from the cases Marks cites in support of his argument. That Marks eventually consumed a few of the pills himself does not negate his prior distributive intent (which the court found applicable to each of the pills Marks acquired) as a matter of fact or logic. Nor does the general knowledge that some small number of the pills he was acquiring to distribute would, in fact, likely end up in his own mouth. As the district court recognized, one can purchase a bottle of pills with the intention of distributing them while at the same time having a contingent intention to take a few himself if the spirit so moves him.[3]

---

[3]For this same reason, we reject Marks's argument that the district court erred in considering a morphine sulfate prescription that he returned to the pharmacy and exchanged for a different formulation. In our view, in including these pills in the drug quantity calculation, the district court supportably found that the

-11-

Marks alternatively attacks the district court's factual determinations regarding his possession of oxycodone and morphine sulfate. Faulting the court's analysis as failing to recognize that he treated these drugs differently from the others he distributed, he alleges that "[t]he preponderance of the evidence supports a finding [of intent] to distribute, at most, a handful of these two types of pills."[4] Again, we note that the district court specifically found that Marks had not been truthful about the quantities of pills he consumed, and that he had "misrepresented those quantities for the deliberate and self-serving purpose of influencing the calculation of the Guideline range in his favor." Because the other drugs at issue in this case have virtually no effect on sentencing, we interpret the district court's statement

_____

returned prescription had been obtained with the intention that the pills would be available for distribution if Marks chose.

[4]On appeal, the bulk of Marks's arguments regarding morphine sulfate relate to the district court's fact findings as to his intent in possessing the drug. But Marks also notes, without elaboration, that he did not plead guilty to the charges involving morphine sulfate. To the extent this comment can be interpreted as an allegation of legal error based on the consideration of drug quantities that were the subject of dismissed counts -- and, perhaps more importantly, to the extent we can even consider such an undeveloped argument, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work") -- we reject it. See USSG § 1B1.3 cmt. background ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."); see also United States v. Carrozza, 4 F.3d 70, 80 (1st Cir. 1993) ("Relevant conduct increases a defendant's sentence, sometimes very significantly, despite the fact that it was not charged in an indictment.").

as a finding that Marks lied about how much oxycodone and morphine sulfate he consumed. Such a conclusion entitles the district court not only to reject Marks's testimony but also to conclude that Marks had a motive to lie, namely to conceal the quantity of drugs he distributed and intended to distribute. See generally United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989) (concluding, in jury-trial context, that factfinder was entitled to conclude that defendants' fabricated stories were "all the more proof of their guilt").

Independent of Marks's testimony, the court heard evidence that Marks distributed oxycodone and morphine sulfate to various witnesses; that he rarely took his medication; that he kept stockpiles of pills in his apartment; that he refilled his prescriptions while he still had medication left; that he bragged about using pills to attract teenage girls; and that he attempted to dispose of his pills once he knew he was under investigation. This and other evidence introduced at the hearing allowed the district court to draw reasonable inferences regarding Marks's intent in possessing the drugs, including the oxycodone and morphine sulfate. The district court's fact findings were not clearly erroneous. See United States v. Rodriguez, 336 F.3d 67, 72 (1st Cir. 2003) ("Where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous.").

Affirmed.

-13-