# United States Court of Appeals
## For the First Circuit

No. 03-2425

UNITED STATES OF AMERICA,

Appellee,

v.

KEVIN R. HALL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

Edward S. MacColl, with whom Thompson, Bull, Furey, Bass & MacColl, LLC, P.A. was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

January 12, 2006

**HOWARD**, **Circuit Judge**.   A federal grand jury in Maine returned an indictment against Kevin Hall charging him with one count of conspiring to distribute marijuana,  21 U.S.C. §§ 841(a)(1) & 846; 163 counts of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), for his use of the conspiracy proceeds; and four counts of tax evasion, 26 U.S.C. § 7201, for failing to pay income tax on the drug-related income.  The government also brought two forfeiture counts to obtain assets related to Hall's illegal conduct, 21 U.S.C. § 853; 18 U.S.C. § 982.  After a ten-day jury trial, Hall was convicted on all counts.  He was sentenced to 151 months of imprisonment on the conspiracy and money laundering convictions,  to  be  served  concurrently  with  60  months  of imprisonment on each of the tax evasion convictions.  He also was ordered to forfeit his illegally obtained assets.  On appeal, Hall claims that there was insufficient evidence of a drug conspiracy or money laundering and alleges a host of trial and sentencing errors.

### SUFFICIENCY OF THE EVIDENCE CLAIMS

We review Hall's sufficiency of the evidence claims de novo, see United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005), and apply the following standard:

> We must determine whether the evidence, taken in the light most favorable to the government--a perspective that requires us to draw every reasonable inference and resolve credibility conflicts in a manner consistent with the verdict--would permit a rational trier of fact to find each element of the crime charged beyond a

-2-

> reasonable doubt. The government can meet this burden by either direct or circumstantial evidence, or by any combination of the two. Moreover, the government need not disprove every hypothesis consistent with the defendant's innocence; rather, it is enough that a rational jury could look objectively at the proof and supportably conclude beyond a reasonable doubt that the defendant's guilt has been established.

United States v. Patel, 370 F.3d 108, 111 (1st Cir. 2004).

### A.    Drug Conspiracy

Hall contends that there was insufficient evidence of his participation in a drug trafficking conspiracy because the government established only that he purchased marijuana from another individual and resold it. According to Hall, proof of a buyer/seller relationship is not sufficient to establish a drug conspiracy.

This contention does not warrant extended discussion. It is enough to say that Hall understates the strength of the government's evidence. There was proof that from 1995 to 1999 Hall bought large amounts of marijuana from an individual named John Redihan. Redihan testified that he was aware that Hall's purpose was to resell the drugs for profit and that, on occasion, he assisted Hall in these efforts. See United States v. Berrios, 132 F.3d 834, 841-42 (1st Cir. 1998) (concluding that there was sufficient proof of a distribution conspiracy where seller knew that buyer was purchasing drugs for the purpose of selling it to

others and intended to facilitate the resales).  Moreover, Hall enlisted several other individuals to help him in the storage, preparation, and selling of the drugs.  For example, an individual named William Lee sold marijuana for Hall, and a married couple, George and Brenda Elliot, assisted Hall by letting him store drugs in their home, helping him weigh the drugs, picking up marijuana deliveries from Redihan, and participating in Hall's debt collection efforts.  This evidence sufficiently established Hall's participation in a conspiracy to distribute marijuana.

### B.      Money Laundering

The government charged Hall with 163 counts of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) for his use of the drug conspiracy proceeds.  To sustain a conviction under § 1956(a)(1)(B)(i), the government must prove: (1) that Hall knowingly conducted a financial transaction, (2) that he knew that the transaction involved funds that were proceeds of some form of unlawful activity, (3) that the funds were proceeds of a specified unlawful activity, and (4) that Hall engaged in the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.  See United States v. Cornier-Ortiz, 361 F.3d 29, 37 (1st Cir. 2004).  Hall's sufficiency claims relate primarily to the government's proof on the "conceal or disguise" element.  He asserts that all of the

-4-

financial transactions were conducted above board and were thus not meant to conceal or disguise anything. In essence, Hall's argument is that the government proved only that he spent or invested drug money and that this evidence is inadequate to sustain a conviction under § 1956(a)(1)(B)(i).

It is true that the money laundering statute does not criminalize the mere spending or investing of illegally obtained assets. See United States v. Corchado-Peralta, 318 F.3d 255, 259 (1st Cir. 2003). Instead, at least one purpose for the expenditure must be to conceal or disguise the assets. See id. Proof of this element may be based on direct evidence, such as the defendant's own statements; or circumstantial evidence, like the use of a third-party to disguise the transaction; or unusual secrecy in making the transaction. See Cruzado-Laureano, 404 F.3d at 483.

In this case the government charged a series of financial transactions as separate counts. See United States v. Marshall, 248 F.3d 525, 540 (6th Cir. 2001). We must therefore examine the government's proof on each count to determine its sufficiency. See United States v. Shepard, 396 F.3d 1116, 1121 (10th Cir. 2005). The 163 counts essentially involve loans to friends and colleagues and related transactions, purchases of cars and other vehicles, expenditures to renovate property, and establishing a construction business.

-5-

1.    Loans and Related Transactions

i. Cosby/Brown Loans (Counts 2-97)

In 1995, Hall offered to loan $30,000 to Danny Cosby and his girlfriend, Susan Brown, to buy a parcel of land.  Cosby and Brown accepted Hall's offer and, after executing a mortgage to secure the loan, Hall gave them the loan proceeds in cash.  In 1996, Cosby and Brown borrowed another $25,000, which Hall also paid out in cash.  Over the next several years, Hall negotiated 96 repayment checks from Cosby and Brown, including a $33,000 check to pay off the remainder of the loans.

When Cosby and Brown asked Hall where he got the money for the loans, he told them that he got most of it from an inheritance from his father.  But there was evidence that Hall's father had intentionally omitted him from his will and that Hall did not receive anything from his father's estate.  There also was testimony that, in regard to a loan to another person, Hall stated that the reason he wanted to loan money was to "get some of his money more legal."

The government charged each negotiation of a loan repayment check as a separate money laundering count.  Hall claims that there "was nothing suspicious about the loan" repayments because he made no attempt to conceal his identity when dealing with Cosby and Brown in making the loans or negotiating the repayments.   This  argument  misconstrues  the  purpose  of  §

1956(a)(1)(B)(i). The statute criminalizes conduct designed to conceal or disguise the source of the drug proceeds even if the defendant does not conceal his own identity in the process. See, e.g., United States v. Norman, 143 F.3d 375, 377-78 (8th Cir. 1998); United States v. Starke, 62 F.3d 1374, 1384 (11th Cir. 1995); United States v. Kinzler, 55 F.3d 70, 73 (2d Cir. 1995); United States v. Lovett, 964 F.2d 1029, 1034 n.3 (10th Cir. 1992).

While Hall arranged the loans himself and negotiated the checks in his own name, there was evidence that one purpose for the loans was to disguise the illegal origin of the loan funds. Hall admitted as much when he claimed to another individual that he wanted to loan money to "get some of his money more legal." Hall made this comment regarding a different loan, but the jury could infer that the same motivation applied to other similar loans which Hall made while running his marijuana trafficking operation. Additionally, Hall intentionally misled the borrowers about the source of the proceeds by telling them that he obtained the money from a family inheritance. Such a misstatement is probative of concealment. See United States v. Tekle, 329 F.3d 1108, 1114 (9th Cir. 2003) (affirming money laundering conviction based on evidence that defendant lied about the origin of funds that he used to purchase a home); United States v. Wilson, 77 F.3d 105, 109 (5th Cir. 1996) (affirming money laundering conviction where defendant

said that money was from an inheritance to "cover" for the cash purchase). This evidence is sufficient to sustain the convictions.

### ii. Moving Funds to an E*Trade Account (Count 98)

As mentioned above, Cosby and Brown provided Hall with a $33,000 check to pay off their debt. After receiving the check, Hall placed these funds in his bank account for a few days before moving them to an E*Trade investment account. The government charged the moving of the funds as money laundering. Hall claims that "there was absolutely nothing about the transaction that suggested concealment or an intent to conceal."

We agree that there is nothing about the transfer of money from Hall's bank account to his E*Trade account that, standing alone, necessarily suggests an intent to conceal. But the transfer cannot be viewed in isolation. It was part of the series of transactions that began with the loans to Cosby and Brown. "A design to conceal on a particular transaction may be imputed to a subsequent transaction if the subsequent transaction, while innocent on its face, is part of a larger money laundering scheme." United States v. Burns, 162 F.3d 840, 848-49 (5th Cir. 1998) (internal citation and quotation marks omitted). This is so because a "launderer can never be sure that he has run the money through enough laundering cycles to make it clean enough so that the government can't find the stains." B. Williams & F. Whitney, Federal Money Laundering: Crimes and Forfeitures § 5.1.6.4 (1999).

Given the proof that the original loans to Cosby and Brown were motivated by Hall's desire to conceal the source of the funds, the jury could infer that Hall's continued shuffling of the money through accounts was an attempt to further separate the money from its illegal source.  See Burns, 162 F.3d at 848-49 (affirming money laundering conviction based on bank deposit which when viewed in isolation was innocent, but when viewed in context was part of a scheme to launder funds).[1]

### iii. Recording a Mortgage (Count 161)

As security for a loan that Hall made to Felicity Hyde (Count 160), Hall recorded a mortgage on property that Hyde owned. The government charged the recording of the mortgage as a separate count of money laundering.  Hall contends that the recording of the mortgage does not constitute money laundering because it is not a "financial transaction" as defined under the money laundering statute.  See 18 U.S.C. § 1956 (3)(c)(4).  This argument was not raised below, and therefore our review is for plain error.  See United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003).

As a threshold for relief under the plain error standard, Hall must show that the district court committed a clear and

_____

[1]Counts 119-121, 125-150, 155-157 and 160 also concern loan repayments Hall received and Hall's subsequent distribution of the loan proceeds.  For each count, there was evidence similar to the proof presented for counts 2-98.  Hall has not provided additional grounds for overturning these convictions.  We therefore affirm these convictions for substantially the same reasons that we affirm the convictions for counts 2-98.

-9-

obvious error by not dismissing this count on the ground that recording the mortgage was not a financial transaction. See United States v. Marino, 277 F.3d 11, 32 (1st Cir. 2002). The money laundering statute defines a financial transaction as a transaction which "in any way or degree affects interstate commerce" and, among other things "involves the transfer of title to any real property." This definition is construed broadly. Federal Money Laundering, supra § 2.3 (citing S. Rep. 99-433 at 13 (1986)). A mortgage is "a conveyance of title to property that is given as security for the payment of a debt . . . that will become void upon payment . . . according to the stipulated terms." Black's Law Dictionary 1031 (8th ed. 1999) (emphasis supplied). The recording of the mortgage thus memorialized and made efficacious "transfer of title to any real property," and would seem to constitute a "financial transaction." In any event, we are aware of no caselaw to the contrary, and therefore the district court's error, if any, was not clear or obvious. See Patel, 370 F.3d at 118.

### 2. Vehicle Purchases

#### i. Pickup Truck (Count 99)

In April 1997, Hall purchased a used one-ton pickup truck. Hall found an advertisement for the truck in a local magazine and called the owner, Mark Stevens, to inquire about it. After a few contacts, Hall and Stevens agreed on a $12,000 purchase price. Hall asked that Stevens deliver the truck to his house.

Although Stevens found that request peculiar, he complied and upon delivering the truck received from Hall $12,000 in cash in the form of wrapped packages of $20 bills. Hall contends that this evidence does not suggest an effort by him to conceal the funds used for the transaction.

"The conversion of cash into goods or services as a way of concealing or disguising [a] wellspring of . . . cash is a central concern of the money laundering statute." United States v. Jackson, 935 F.2d 832, 841 (7th Cir. 1991). "Because cash is a frequent by-product of many kinds of illegal activity, converting . . . cash into useable funds is probative of money laundering. Thus, spending large amounts of cash to buy cars . . . may suggest an intent to conceal." Federal Money Laundering supra at § 5.16.11.

The jury heard evidence that Hall paid for the truck with wrapped packages of small bills. Hall's use of small bills made it more difficult for anyone to trace the truck payment. See United States v. Misher, 99 F.3d 664, 668-69 (5th Cir. 1996) (concluding that proof that drug dealer purchased pickup truck with $10 and $20 bills was sufficient for the jury to conclude that a purpose of the purchase was to conceal the source of the funds); United States v. Heater, 63 F.3d 311, 319 (4th Cir. 1995) (concluding that proof that defendant made several large purchases using small bills which exceeded his lawful income was sufficient to sustain money

laundering conviction).  Additionally, as we will discuss below, the government introduced evidence of other vehicle purchases for which there was additional proof that Hall made the purchases to conceal his drug income.  The jury could have relied on this evidence to conclude that the pickup truck purchase was part of a single pattern of concealment.  Taken in total, this evidence suffices to sustain the conviction on count 99.

### ii. 1988 Ford Dump Truck (Counts 100-01)

In August 1997, Hall provided his sister, Andrea Read, with $16,000 cash to purchase a money order in her name payable to O'Connor GMC.  Hall used the money order along with an additional $500 in cash to purchase a dump truck.  Hall's use of his sister's name in purchasing the money order is evidence of his intent to conceal because it indicates that he was attempting to disguise the source of the proceeds by having it pass through another person's control.  See United States v. Willey, 57 F.3d 1374, 1385 (5th Cir. 1995) (stating that "using a third party, for example, . . . a relative, to purchase goods on one's behalf . . . usually constitutes sufficient proof of a design to conceal").  Moreover, Redihan testified that Hall told him that he had set up a fictitious "inheritance account" in which the money "was cleaned" and used to purchase construction equipment such as a dump truck.

Thus, the jury could have found that this purchase was part of the money laundering scheme.[2]

### iii. 1932 Ford Coupe (Count 102)

In August 1997, Hall purchased a restored 1932 Ford Coupe from Terrence Blair for $24,000. When Blair delivered the car to Hall, Hall gave him a paper bag filled with cash. At Hall's request, Blair wrote the bill of sale for only $5,000. In addition to the use of cash to make the purchase, Hall's request for a false bill of sale suggests concealment because it permitted Hall to include an additional $19,000 in the purchase price that could not easily be traced. See Wilson, 77 F.3d at 109 (affirming money laundering conviction where defendant asked seller of car to say that he sold the car to him for half of the actual purchase price).[3]

### 3. Renovations and Fire Island Construction

---

[2]Redihan's testimony is also sufficient to affirm the convictions on counts 103-118 and 122-124 which relate to Hall's purchase of other pieces of construction equipment.

[3]There was evidence that Hall requested false bills of sale for his purchases of a 1970 Volkswagon (count 154) and a 1965 Corvette (count 158). We affirm these convictions on this basis. We also affirm the conviction concerning Hall's purchase of a 1995 Volvo (count 151), as there was evidence that Hall attempted to conceal certain loan repayment funds by purchasing this vehicle. Additionally, we affirm the conviction concerning Hall's purchase of an all-terrain vehicle (count 159) on the ground that the jury could conclude that this purchase (made in cash) was part of the same laundering scheme as the other vehicle purchases. Hall has not challenged the convictions on counts 152 and 153 which relate to his purchase of a 1992 Ford Explorer.

i.  Renovations to Hall's Real Estate
Holdings (Counts 162-163)

In 1997 and 1998, Hall paid almost $100,000 for supplies and labor to renovate property that he owned in Camden and Northport, Maine.  Hall argues that he organized the work himself and therefore there was no effort on his part to conceal or disguise the drug funds.

But, as discussed above, the issue is not whether Hall hid his identity in performing these renovations but rather whether one purpose of the transaction was to conceal or disguise drug proceeds.  See supra at 6-7.  The government presented evidence that Hall paid for the labor and materials using mostly cash and that he did not keep records of the labor costs.  The evidence also established that Hall spent far in excess of his declared income to make these renovations.  See United States v. Webster, 960 F.2d 1301, 1308 (5th Cir. 1992) (holding that "a differential between [a drug dealer's] legitimate income and cash flow is sufficient for a money laundering conviction").  A jury could conclude that Hall's expenditures of large amounts of cash, far in excess of his reported income, coupled with his non-existent bookkeeping practices demonstrated that he renovated the properties as a way to disguise illegally obtained cash by converting the money into expensive real estate holdings.[4]

---

[4]Hall also argues that these counts should have been dismissed because the government did not charge each expenditure related to

                    ii.   Transferring Assets to Fire Island
                          Construction (Count 164)

     The final count of money laundering charged Hall with

transferring over $80,000 in assets to a construction company that

he established called Fire Island Construction.  Hall again claims

that the government failed to prove the concealment element of the

offense.  Hall's objection to this count fails on the basis of his

statements to others.  See Cruzado-Laureano, 404 F.3d at 483. There

was testimony that Hall said that he established Fire Island

Construction "to make him look legitimate" and that he transferred

construction equipment to Fire Island as part of a scheme to "clean

up some [of the] money."  The jury could infer from this testimony

that Hall's creation of Fire Island Construction and the subsequent

transfer of property to the company was at least partially

motivated by his desire to disguise the source of his drug

proceeds.[5]

_____

the renovations as a separate offense.  He argues that each
renovation expenditure was a distinct transaction and therefore
should have been charged separately.  This argument was first
raised on appeal, and we therefore limit ourselves to plain error
review. The term transaction "may comprehend a series of many
occurrences, depending not so much upon the immediateness of their
connection as upon their logical relationship."  Moore v. N.Y.
Cotton Exchange, 270 U.S. 593, 610 (1926).   It was not clearly
wrong for the district court to view Hall's numerous renovation
expenditures as one transaction even though it was comprised of
several "subtransactions."  Federal Money Laundering supra at §
2.2.2.

     [5]Hall also challenges his money laundering convictions on the
ground that the government failed to establish a nexus between the
money laundering transactions and interstate commerce as required

                              -15-

**TRIAL-ERROR CLAIMS**

## A.    Brady Violation

Hall claims that the government committed a <u>Brady</u> violation by withholding information concerning the extent of Redihan's prior criminal history. See <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83, 87 (1963) (holding that prosecution violates defendant's due process rights by withholding evidence from defense that is material to either guilt or punishment); <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150, 154 (1972) (applying <u>Brady</u> to impeachment evidence). Before trial, the government disclosed Redihan's prior convictions, including a 1998 drug conviction in Rhode Island. As part of the disclosure, the government told defense counsel that the Rhode Island conviction involved the sale of Percodan and steroids, but after trial, it was discovered, through the preparation of Hall's presentence report, that the conviction also involved allegations of marijuana distribution.

Hall asserts that this omission prejudiced his defense. One of Hall's defenses was that, while he sold small amounts of marijuana, he was not involved in the large-scale trafficking

---

by 18 U.S.C. § 1956(a)(3)(B). This argument was not raised below. While Hall claims that "many of the transactions" fail the interstate commerce requirement, he has provided us with only a skeletal argument and has not cited any authority to support his claim. This sort of underdeveloped argument is inadequate for Hall to sustain his "heavy burden" of demonstrating plain error for this unpreserved claim. <u>United States</u> v. <u>Moran</u>, 393 F.3d 1, 13 (1st Cir. 2004).

charged in the indictment. Hall argues that evidence concerning the nature of Redihan's Rhode Island conviction was important because it would have shown that Redihan lied when he testified that Hall was his major customer during the period of the charged conspiracy. He posits that, if he could have shown that Redihan was supplying drugs to many people, the jury would have been less likely to believe that Redihan was selling him such large quantities of marijuana. The government counters that there was no Brady violation because it was unaware of the marijuana aspects of the Rhode Island conviction until after the trial, and in any event the unavailability of this information was not prejudicial to Hall's defense.

Hall's Brady argument fails because there is no evidence that, prior to the conclusion of the trial, the government had information concerning the marijuana aspect of Redihan's Rhode Island conviction. The information that Redihan's Rhode Island conviction concerned marijuana trafficking came from a police report which the government states that it learned about only after the probation department discovered it during Hall's presentence investigation.

The government's obligations under Brady only extend to information in its possession, custody, or control. See United States v. Josleyn, 206 F.3d 144, 153-54 (1st Cir. 2000). Nevertheless, Hall contends that the government had a duty to learn

-17-

and disclose the details of Redihan's Rhode Island convictions and not just the fact of the conviction. While a prosecutor must disclose information maintained by government agents even if the prosecutor herself does not possess the information, see Strickler v. Greene, 527 U.S. 263, 280 (1999), this duty does not extend to information possessed by government agents not working with the prosecution, see United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002). The information concerning the details of Redihan's conviction was maintained by the Rhode Island state courts, and there is no evidence that the federal prosecutor or any agent working on her behalf had this information prior to or during trial. See id.

Moreover, even assuming the government had to disclose the details of Redihan's Rhode Island conviction, Hall has not shown sufficient prejudice to warrant relief. Brady prejudice exists where "there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler, 527 U.S. at 281-82. Hall elicited from Redihan, on cross-examination, that he was a convicted drug dealer and that he had distributed drugs in Rhode Island. Additional detail about the Rhode Island conviction would have been mostly cumulative. See Lavallee v. Coplan, 374 F.3d 41, 46 (1st Cir. 2004). There also was substantial evidence of Hall's participation in a drug conspiracy aside from Redihan's testimony. Several other members of the

conspiracy testified about Hall's criminal conduct. In sum, we are persuaded the disputed information, if known to Hall, would not have affected the trial's outcome. See United States v. Schneiderman, 404 F.3d 73, 79 (1st Cir. 2005).

## B.    Redihan's Plea Agreement

Hall next challenges the admission of Redihan's plea agreement for conspiring with Hall to distribute drugs. While Hall's brief is not explicit, he appears to object to the admission of the plea agreement because the agreement was conditioned on Redihan's truthful testimony at Hall's trial. According to Hall, admitting the agreement had the effect of bolstering Redihan's credibility in the jury's eyes.

We have previously concluded that "informing the jury of the contents of a plea agreement of, at least, normal stripe," is permissible. See United States v. Martin, 815 F.2d 818, 821 (1st Cir. 1987). Hall has not presented any claim that Redihan's plea agreement was atypical or outside the rule stated in Martin.

Hall also claims that the district court did not provide an appropriate cautionary instruction concerning the jury's consideration of the plea agreement. We disagree. The court instructed the jury that "[s]ome people [testifying pursuant to a plea agreement] are entirely truthful when testifying. Still, you should consider the testimony of these individuals with particular caution. They may have had reason to make up stories or exaggerate

-19-

what others did because they wanted to help themselves."  Hall did not object to this instruction or propose other language, and the instruction was not clearly erroneous as given.

### C.          Money Laundering Jury Instruction

The next challenge concerns the jury instruction on the concealment element of money laundering.  The district court instructed that the concealment element was satisfied if the jury concluded that "Hall knew that the transaction in question was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the marijuana trafficking."  Hall objected to this instruction on the ground that the instruction did not sufficiently convey that he had to intend specifically to conceal the drug proceeds.

We review challenges to the wording of a jury instruction for abuse of discretion.  See United States v. Tom, 330 F.3d 83, 91 (1st Cir. 2003).  The court's instruction closely tracked the language of the statute, which is a strong indicator that the charge passes muster.  See, e.g., United States v. Rosa, 705 F.2d 1375, 1381 (1st Cir. 1983).  In any event, the instruction clearly conveyed that Hall had to intend the transactions to conceal drug proceeds by requiring such a design on Hall's part.  The instructions were thus adequate.

**D.      Agent Giguere's Testimony**

Near the close of its case, the government called Internal Revenue Service Agent Rodney Giguere to testify concerning his investigation of Hall's finances.  Relying on our recent decisions in United States v. García-Morales, 382 F.3d 12, 16-17 (1st Cir. 2004) and United States v. Casas, 356 F.3d 119-120 (1st Cir. 2004), Hall challenges Giguere's testimony as improper overview testimony.  He also suggests Giguere provided prejudicial summary testimony.  Evidentiary rulings are reviewed for abuse of discretion.  See United States v. Perez-Ruiz, 353 F.3d 1, 11 (1st Cir. 2003).

Hall's reliance on García-Morales and Casas is misplaced. In both cases, we were addressing the problem of the prosecution beginning its case-in-chief by calling a government agent to provide an overview of its case.  We criticized that practice because "such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence."  Casas, 356 F.3d at 119.

Here, Giguere did not testify until near the end of the government's case-in-chief.  Most of his testimony concerned his description of his investigation into Hall's activities.  This testimony was appropriate because it was based on Giguere's personal knowledge.  See García-Morales, 382 F.3d at 16.  On a

couple of occasions, Giguere testified to hearsay statements made to him during the investigation. But Hall did not object to Giguere's answers, and the testimony was hardly prejudicial.

To the extent that Giguere provided summary testimony, it concerned the travel of Hall's funds in and out of various accounts and was based on testimony and documents in evidence. This sort of testimony is permissible to summarize complex aspects of a case such as the financial dealings of a defendant. See Casas, 120 F.3d at 120 n.4. Furthermore, the court cautioned the jury that it should rely on its own memory of the facts and not the summary provided by Giguere. We discern no abuse of discretion.

### E.    Prosecutorial Misconduct

Hall alleges that the government violated his Fifth and Sixth Amendment rights by threatening certain witnesses with severe consequences if they did not testify on the government's behalf. Specifically, one witness, Andrea Read, testified that government agents told her that she would face prosecution if she did not tell them "what they wanted to hear," and a second witness, Steven Hiscock, testified that a government agent told him that, if he did not cooperate, the government "would take his home." Both witnesses testified on behalf of the government and were examined about the nature of the threats and the effect, if any, these threats had on their testimony.

We have recognized that a due process violation can occur where the government intimidates or harasses potential defense witnesses to discourage them from testifying.  See United States v. Anguilo, 897 F.2d 1169, 1192 (1st Cir. 1990).  Hall has cited a series of cases in which appellate courts have overturned convictions where the prosecution coerced a potential witness not to testify on behalf of the defendant.  See, e.g., United States v. Morrison, 535 F.2d 223, 226 (3d Cir. 1976); United States v. Smith, 478 F.3d 976, 978-79 (D.C. Cir. 1973).  These case are distinguishable because, here, the challenged conduct was intended to encourage witnesses to testify.  Anguilo and the cases cited by Hall recognize a constitutional problem when the defendant is precluded from putting on the defense of his choice because the government threatens a person into not testifying.  See also Webb v. Texas, 409 U.S. 95, 98 (1972) (per curiam) (stating that threatening comments by a judge that "effectively drove the witness off the stand" violated the defendant's constitutional right to present his defense).

Hall does not claim that he was deprived of testimony but rather that Read and Hiscock may have testified falsely because of the government's alleged threats.  The problem is a complicated one because in many cases the government has to press unwilling witnesses, out of fear or friendship, are reluctant to give.  There

is no blanket rule against inducements by the government to witnesses to produce truthful testimony.

We will assume that, in extreme circumstances, government misconduct, could occur through improper efforts to shape testimony to the government's liking. In this instance, however, there was conflicting testimony as to whether the government actually threatened Read or Hiscock and defense counsel was allowed to cross-examine on the issue, leaving it to the jury to evaluate witness credibility in light of the evidence concerning the alleged threats. We do not find a constitutional violation.

Hall also asserts that his constitutional rights were violated by the government convincing his wife, Jill Hall, to invoke her Fifth Amendment privilege against self-incrimination and to decline to testify on his behalf during sentencing. Before Ms. Hall testified, the government informed the court that Ms. Hall was a target of an investigation for conduct related to the crimes for which her husband had been convicted. In response to the government's representation, the court summoned Ms. Hall's lawyer to discuss with her the possible consequences of her testimony. After Ms. Hall and her lawyer consulted, she decided to invoke her privilege not to testify, and the court upheld her invocation.

Under these facts, the government did not substantially interfere with Hall's ability to call his wife as a witness. The court found that Ms. Hall properly invoked her Fifth Amendment

privilege. There is no evidence that the government acted in bad faith by notifying the court that Ms. Hall was the target of an investigation. Moreover, the court handled the matter appropriately by alerting Ms. Hall to the possible consequences of testifying and assuring that an attorney was present to counsel Ms. Hall on her decision of whether to invoke her Fifth Amendment privilege. See United States v. Serrano, 406 F.3d 1208, 1216 (10th Cir. 2005) (rejecting claim of government interference with witness on similar facts).[6]

## FORFEITURE AND SENTENCING ERROR CLAIMS

### A.      Forfeiture

After finding Hall guilty on all counts, the jury returned forfeiture findings concerning Hall's drug trafficking and money laundering activities. See 21 U.S.C. § 853 (forfeiture for drug trafficking); 18 U.S.C. § 982 (forfeiture for money laundering). After the jury returned these findings, the court entered a forfeiture order pursuant to Fed. R. Crim. P. 32.2. In regard to the drug trafficking forfeiture, the court imposed a money judgment in the amount of $511,321.22 and ordered the forfeiture of specific items of personal and real property which

---

[6]Hall also claims that the trial was conducted in such a way that it denied him due process of law. He offers a litany of complaints to support the claim. We have reviewed the entire transcript of Hall's trial and conclude that the district court presided ably over this complex case, assuring that Hall's procedural rights were protected at every turn.

-25-

the jury found were connected Hall's drug activities. The money laundering forfeiture order commanded Hall to turn over specific items of property (in accord with the jury's findings) but did not impose an additional money judgment. Both orders permitted the government to seize "substitute property" under certain circumstances to satisfy the forfeiture amount.[7]

Hall's first challenge concerns the district court's entry of a money judgment as part of the drug trafficking forfeiture. A money judgment permits the government to collect on the forfeiture order in the same way that a successful plaintiff collects a money judgment from a civil defendant. Thus, even if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order. Relying on United States v. Croce, 334 F. Supp. 2d 781 (E.D. Pa. 2004), Hall argues that a court may not issue a money judgment as part of a forfeiture order.

Croce is at odds with the law of this circuit. In Candelaria-Silva, 166 F.3d at 42, we ruled that a "criminal forfeiture may take several forms [including] an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense." This position

---

[7]Substitute property may be seized by the government to satisfy a forfeiture order where, by an act or omission, the defendant has prevented the government from tracing his illegally obtained assets. See United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999).

accords with the several appellate decisions that have addressed the question. See United States v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005); United States v. Baker, 227 F.3d 955, 970 (7th Cir. 2000); United States v. Lester, 85 F.3d 1409, 1413 (9th Cir. 1996); United States v. Robilotto, 828 F.2d 940, 948-49 (2d Cir. 1987); United States v. Ginsburg, 773 F.2d 798, 801-03 (7th Cir. 1985) (en banc).

There are two primary reasons for permitting money judgments as part of criminal forfeiture orders. First, criminal forfeiture is a sanction against the individual defendant rather than a judgment against the property itself. See United States v. Nava, 404 F.3d 1119, 1124 (9th Cir. 2005); United States v. Cunan, 156 F.3d 110, 116 n.7 (1st Cir. 1998). Because the sanction "follows the defendant as a part of the penalty," the government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction. Robilotto, 828 F.2d at 948-49. Second, permitting a money judgment, as part of a forfeiture order, prevents a drug dealer from ridding himself of his ill-gotten gains to avoid the forfeiture sanction. In rejecting an argument against the use of money judgments pursuant to the RICO forfeiture statute, the Seventh Circuit explained:

> What the defendant's argument overlooks is the fact that a racketeer who dissipates profits or proceeds of his racketeering activity on wine, women, and song has profited from organized crime to the same extent as if he had

-27-

put the money in his bank account. Every dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes. In order to truly separate the racketeer from his dishonest gains, therefore, the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession.

Ginsburg, 773 F.2d at 802. The policy rationale for permitting a money judgment as part of a forfeiture in a racketeering case applies equally to a forfeiture in a drug case. See Nava, 404 F.3d at 1124 n.1 (stating that RICO forfeiture cases are useful in interpreting the drug forfeiture statute because the statutes are "substantially identical"). The district court did not err in entering a money judgment as part of the drug trafficking forfeiture.[8]

Hall next contends that the forfeiture orders wrongly permit the government to seize substitute property. He argues that the power to forfeit substitute property rests exclusively with the court.

---

[8]Hall also contends that, even if the court could enter a money judgment, it could not enter both a money judgment and a forfeiture of specific assets as part of the same order. Hall has cited no authority for this proposition, and there are several cases in which such hybrid orders have been entered. See, e.g., Baker, 227 F.3d at 959; Candelaria-Silva, 166 F.3d at 42.

Federal Rule of Criminal Procedure 32.2(e) provides the procedure for the forfeiture of substitute property. It states: "On the government's motion, the court may at anytime enter an order of forfeiture or amend an existing order of forfeiture to include property . . ." that is substitute property under an applicable statute. Fed. R. Crim. P. 32.2(e)(1). The forfeiture orders in this case state that the government may "forfeit" substitute property. It is not clear whether this means that the government may move for forfeiture or may seize the substitute property without any action by the court.

The government acknowledges that only the court can order the forfeiture of substitute property. In light of this acknowledgment and the plain language of Fed. R. Crim. P. 32(e)(1), we interpret the forfeiture orders in this case to permit the government to move for substitute property but to reserve for the court the authority to order the property forfeited.[9]

### B. Sentencing

Hall raises several challenges to his sentence. He

---

[9]Hall also asserts that the forfeiture of his real property holdings was erroneous because there was insufficient evidence for the jury to have found a nexus between his real estate holdings and his drug trafficking and money laundering activities. We disagree. The jury could have found that Hall renovated his property with drug proceeds and that he used one of the properties to receive a shipment of drugs. This evidence is sufficient to support the jury's forfeiture finding. See United States v. Desmarais, 938 F.2d 347, 353 (1st Cir. 1991); United States v. Parcels of Land, 903 F.2d 36, 39 (1st Cir. 1990).

claims that the district court clearly erred in its drug quantity calculation and in its application of the obstruction of justice enhancement. He also claims that the court should have awarded him a downward adjustment for acceptance of responsibility. Finally, he claims that he is entitled to re-sentencing because the district court treated the Sentencing Guidelines as mandatory.

In deciding Hall's sentence, the district court applied the grouping rules under the Sentencing Guidelines. See U.S.S.G. 3D1.2. The application of these rules led the court to determine that Hall's period of incarceration would be based on his conviction for the drug trafficking conspiracy because it resulted in the highest offense level.

To calculate the offense level for the conspiracy conviction, the court concluded that the conspiracy involved between 700 and 1000 kilograms of marijuana, which led to an offense level of 30. The court then increased the offense level to 34 because of Hall's leadership role and his attempt to obstruct justice by trying to convince Redihan not to testify against him. When combined with a criminal history category of I, Hall's offense level yielded a sentencing range of 151 to 188 months. The court sentenced Hall to 151 months' imprisonment.

### 1. Drug Quantity

The government bears the burden of proving drug quantity by a preponderance of the evidence. See United States v. Sklar,

920 F.2d 107, 112 (1st Cir. 1990). In determining the drug quantity involved in an offense, the district court "may choose between plausible estimates of drug quantity but must err on the side of caution." United States v. Marks, 365 F.3d 101, 105 (1st Cir. 2004). We review the district court's drug quantity calculation for clear error. See id.

The court estimated the drug quantity involved in the conspiracy by determining the total profit that Hall earned from his drug activities and the profit that Hall made per pound. By dividing the total profit by the profit per pound, the court determined that the conspiracy involved between 700 and 1000 kilograms of marijuana. We have previously approved this method for ascertaining drug quantity. See United States v. Gerante, 891 F.2d 364, 369 (1st Cir. 1989).

Nevertheless, Hall contends that the district court's quantity estimation was clearly erroneous because the court relied on unreliable evidence in determining Hall's drug profits. We disagree. The court determined that Hall's overall drug profits totaled $519,000, which was consistent with evidence showing that Hall's unreported taxable income was $518,929. The court also determined that Hall's profit per pound was approximately $300. It based this determination, in part, on Hall's own statement during the sentencing hearing that he earned between $200 and $400 profit per pound of marijuana. This evidence provided a reasonable basis

-31-

for the court to set the variables which it used to calculate the drug quantity.

## 2. Obstruction of Justice Enhancement

Section 3C1.1 of the Guidelines mandates a two-level enhancement where the defendant "willfully . . . attempted to obstruct or impede the administration of justice during the course of the . . . prosecution." One recognized way in which a defendant can obstruct justice is by threatening, intimidating or coercing a witness. See U.S.S.G. § 3C1.1 cmt. 4. The district court found that Hall obstructed justice by trying to coerce Redihan not to testify against him.

Hall contends that the district court erred in applying the enhancement because it did not make a particularized finding as to whether Hall had a specific intent to obstruct justice. We recently declined to decide whether there must be a particularized finding that the defendant had a specific intent to obstruct justice to impose a § 3C1.1 enhancement. See United States v. Fournier, 361 F.3d 42, 43 (1st Cir. 2004) (per curiam). We again decline to decide this question because the evidence clearly supports the district court's ultimate finding that Hall attempted to obstruct justice. See id.

The record demonstrates that Hall told Redihan "not to say anything, and that [Hall] would never say anything about [Redihan]." The district court reasonably concluded that Hall was

-32-

trying to silence Redihan by promising him that he would not disclose Redihan's criminal conduct if Redihan refused to testify against him. Hall argues that he merely meant to advise Redihan of his right to invoke his Fifth Amendment privilege against self-incrimination. But, absent a showing of clear error, the meaning of Hall's comment is for the district court to decide. See United States v. Akitoye, 923 F.2d 221, 228 (1st Cir. 1991). The district court's interpretation of Hall's conduct was not clearly erroneous in these circumstances.[10]

### 3. Acceptance of Responsibility

Hall's challenge to the district court's denial of a downward adjustment for acceptance of responsibility is entirely without merit. See U.S.S.G. § 3E1.1. Under most circumstances, a defendant who goes to trial is not entitled to acceptance of responsibility credit. See United States v. Mikutowicz, 365 F.3d 65, 76 (1st Cir. 2004). Moreover, acceptance of responsibility is not generally available to a defendant whose sentence has been enhanced for obstructing justice. See Fournier, 361 F.3d at 44. Hall went to trial and attempted to obstruct justice in the process. On these facts, the district was not clearly wrong to

---

[10]Hall also challenges the district court's measure of the amount of funds laundered for purposes of calculating the offense level for the money laundering counts. Because Hall does not dispute that the drug conspiracy governs for purposes of determining Hall's punishment under the Guidelines, this challenge is moot. See United States v. Cruz, 156 F.3d 22, 29-30 (1st Cir. 1998).

-33-

conclude that Hall failed to accept responsibility for his crimes.

### 4. Mandatory Guidelines

Finally, by way of supplemental briefing, Hall argues that the district court erred by viewing the Guidelines as mandatory in determining his sentence. See United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005). He does not dispute that he failed to raise this argument below, and we therefore apply the plain error standard. See United States v. Antonakopoulos, 399 F.3d 68, 76-77 (1st Cir. 2005).

Under our post-Booker plain error cases, we will ordinarily remand for resentencing if the defendant demonstrates "either by [evidence] in the existing record or by plausible proffer [that] there is a reasonable indication that the district [court] might well have reached a different result under advisory guidelines." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005). The record discloses the district court's unease with the degree of speculation involved in the drug quantity calculation, as well as the court's recognition of Hall's difficult childhood and later good works. Without forecasting whether these considerations would justify a more favorable sentence, we are persuaded by the record that the district court at least might be inclined to impose such a sentence on remand.

### CONCLUSION

For the reasons set forth, we **affirm** all counts of

conviction and the forfeiture orders but **vacate** Hall's sentence and **remand** for resentencing.

**So ordered**.